[L. A. No. 15338.  In Bank.—July 30, 1936.]

O.  C.· WILLSON, Respondent, v. MUNICIPAL  BOND
    COMPANY (a Corporation) et al., Appellants.

William H. Neblett, John G. Sobieski, Frank G. Swain, Leroy B. Lorenz, Donald J. Dunne, Bailie, Turner & Lake, Frederick W. Lake, Wingert & Bewley and Thomas W. Bewley for Appellants.

Hill, Morgan & Bledsoe, Benjamin F. Bledsoe, Charles P. McCarthy, Kenneth K. Wright and Henry M. Lee for Respondent.

THE COURT.—Defendants Municipal Bond Company, H. H. Cotton and M. D. Fox separately appeal from a judgment in favor of plaintiff, rendered in an action brought by plaintiff against them and others, and predicated upon the alleged fraud of defendants. Although numerous briefs have been filed by counsel representing the parties to this controversy, and although many points are exhaustively discussed therein, basically the appeals present nothing more than a question of fact, viz., Is the implied finding of the jury that appellants are guilty of fraud practiced upon respondent supported by the evidence? It seems almost unnecessary to state the elementary principle that in determining this question all conflicts must be resolved in favor of respondent. Keeping this rule in mind, we are impelled to hold that the implied finding in question receives ample support in the record and that the judgment must, therefore, be affirmed as to all three appellants.

The record supports the following statement of facts: Respondent Willson owned a piece of improved real property in Beverly Hills of the reasonable value of over $200,000. There were two trust deeds, one for $100,000 and one for $16,000, standing against the property. Early in · 1930, Willson became desirous of selling his equity in this property. In June of 1930, he discussed the matter with one Irwin, a real estate broker, and put an exchange value of $235,000 on the property, but indicated he would accept less for cash. Irwin, in looking for a possible deal, got in touch with appellant Fox, also a real estate broker. Fox was well acquainted with appellant Cotton, with whom he had transacted business over a period of 15 years. Cotton was a director of both defendant Bank of America and

appellant Municipal Bond Company, and, in addition, was one of the managing officers of the latter. The bond company dealt largely in improvement bonds and, at that time, owned many issues of public improvement bonds, which it was desirous of exchanging for equities in real property. The bond company at this time knew that many improvement districts and, particularly, several such districts in San Diego County, were in default on bond payments. Cotton informed Fox that the bond company had such bonds and that the company might be willing to exchange some of these bonds for Willson's equity. He also told Fox that he was familiar with Willson's property. After some further discussion with Cotton and with one Stewart, another officer of the bond company, Fox was authorized by them to offer Willson for his equity $85,000 worth of Districts 22 and 40 bonds, which districts were located in San Diego County. Stewart testified that he then knew that some of these bonds were delinquent. Stewart also knew that many other districts in San Diego County were then in default. The evidence produced by respondent, through qualified experts, is that bonds of Districts 22 and 40 had no market value at all on July 1, 1930, and that on that date they could not have been sold at any price. Fox conveyed this offer to Irwin, who discussed it with Willson. Willson agreed to meet Fox to discuss the matter. This meeting took place at the Bank of America in Los Angeles on July 1, 1930. Present were Fox, Willson, Irwin and Hauschild, a friend of Willson, who attended, at the latter's request, to pass upon the escrow instructions. The escrow clerk of the bank was also present at times during this meeting, and it was he who prepared the escrow instructions. Fox had in his possession two sample bonds furnished him by the bond company, which he showed to Willson. Fox repeated the offer which the bond company had authorized him to make. However, Fox did not disclose that the bond company was the real party in interest. Throughout the transaction, Fox represented and Willson believed that Fox was the real owner of the bonds. Cotton and Stewart both knew of this representation, but did not demur, in fact, they acquiesced therein. Willson stated to Fox that he was interested in the proposition, but that he would have to be assured as to the value of the bonds,

and that he would have to make a loan on the bonds. Fox stated that the bonds were "worth 100 cents on the dollar" and that he believed he could negotiate a loan on the bonds from the Bank of America. Fox first suggested a $20,000 loan on $60,000 of bonds, and, when Willson stated that he needed more cash, Fox left the room and, upon his return, stated that he could secure from the bank a $27,500 loan on all the bonds. Fox also stated that in view of the fact that the Bank of America was willing to make a $27,500 loan on the bonds, that indicated that they were worth 100 cents on the dollar. On these representations, without further investigation, Willson agreed to the deal and, on that very day, escrow instructions were drawn up and signed by Willson and Fox as the contracting parties. Willson agreed to pay Irwin the usual brokerage fee, and by arrangement, apparently between Irwin and Fox, Willson acquiescing, half of the fee was made payable to Fox, the escrow instructions expressly so providing. Willson asked Hauschild to approve the form of the escrow. Hauschild had heard of certain improvement districts in San Diego County, described as part of the "Romola deal", which he knew enjoyed an unsavory reputation. He queried Fox as to whether Districts 22 and 40 were part of this deal, and was assured by Fox (and this was the fact) that these two districts were not part of this deal. Hauschild told Willson, in the presence of Fox, that he was contemplating a trip to San Diego over July 4th to visit relatives, and that he would look over the property within the districts.

Fox could not close the deal on July 1st, because the bond company did not have all the bonds in its possession on that date and, furthermore, the required loan had to be negotiated. The escrow instructions provided that Willson was to have until July 7th to approve or disapprove the bonds to be deposited by Fox. The escrow clerk of the bank who drafted the instruction testified that that provision was inserted to protect the bank as escrow holder, and that, since Fox did not have the bonds on July 1st, by this clause Willson was to have the right to ascertain that the bonds which Fox deposited were the bonds called for by the escrow. Most of the bonds were deposited in escrow and approved by Willson on July 3d, but, on that date, by mutual agreement, the time limit on the escrow was

extended to July 30th, in order to permit Fox to secure a few of the bonds which he stated were then in the east.

Hauschild visited San Diego over July 4th and, upon his return, reported to Willson that he had visited the property apparently included within Districts 22 and 40, and that such lands lay between two designated streets and that the bonds apparently were "arterial bonds". There is considerable dispute over the facts surrounding this visit of Hauschild to San Diego, but, taking the evidence most favorable to respondent, as we must, it appears that this visit was not made at Willson's request and that the casual inspection was made, first, to ascertain that there was some land within the two districts, and, second, to ascertain whether the districts were part of the "Romola deal". Neither Willson nor Hauschild made any investigation as to the value of the bonds. Willson testified that he entered the deal in reliance upon Fox's statements that the bonds were worth 100 cents on the dollar and that the bank would lend $27,500 on the bonds as security, and that he would not have entered into the transactions had these representations not been made.

After the July 1st meeting, Fox reported to Cotton and Stewart (in fact, Fox testified that he kept these two men, and other officers of the bond company, fully informed concerning the progress of negotiations), and showed them a copy of the escrow instructions in which Fox was described as the owner of the bonds and in which it was provided, as a condition of the deal, that Fox must negotiate a $27,500 loan *on the bonds* as security. Cotton and Stewart agreed to take up the matter of the loan with the Bank of America. Cotton personally went to Mr. Nolan, president of the bank, and, after some discussion, told Nolan that if the bank would lend $27,500 on the bonds, the bond company would sign a written contract to repurchase the bonds, if the loan were not repaid. Nolan agreed to make the loan on this condition and a formal repurchase agreement was executed between the bank and the bond company. When the promissory note for $27,500, payable to the bank, was presented to Willson for signature, he refused to sign it on the ground that several provisions thereof were objectionable. Fox thereupon secured a sister of an employee in his office to sign the note. Nolan testified that the bank

did not know the signer of the note, nor did the bank investigate the value of the bonds. In other words, the bank made the loan not on the security of the bonds, but upon the security of the repurchase agreement. Willson was kept in complete ignorance of this fact and believed for many months thereafter that the bank had lent the money on the security of the bonds. Willson paid the interest on the loan for about a year, the interest payments totaling about $1860. He then defaulted and the bank sold the bonds, the bond company, pursuant to its agreement, buying them in.

Willson, upon ascertainment of the true facts, instituted this action charging all of the defendants with fraud. The trial court granted a directed verdict in favor of the defendant Bank of America, and no appeal has been taken by the respondent from the judgment in favor of the bank. The jury rendered a verdict against the three appellants in the sum of $59,360.92, the same being the difference between the $27,500 received by Willson and the value of the bonds as represented, plus the interest paid by Willson on the loan.

All three appellants strenuously urge that the statements made by Fox, even if false, were mere expressions of opinion and, as such, not actionable. ▮ The determination as to whether a particular statement is an expression of opinion or an affirmation of a fact is often difficult, and frequently is dependent upon the facts and circumstances existing at the time the statement is made. Under some circumstances, statements as to value of property are deemed to be mere expressions of opinion (*Gleason* v. *McPherson,* 175 Cal. 594 [166 Pac. 332]; *Lee* v. *McClelland,* 120 Cal. 147 [52 Pac. 300]; *Craig* v. *Wade,* 159 Cal. 172 [112 Pac. 891]; *Barbour* v. *Flick,* 126 Cal. 628 [59 Pac. 122]; *Coleman* v. *Dawson,* 110 Cal. App. 201 [294 Pac. 13]; *Pease* v. *Thornburg,* 118 Cal. App. 53 [4 Pac. (2d) 618]; *Lion* v. *McClory,* 106 Cal. 623 [40 Pac. 12]), while under other circumstances, such statements are held to be affirmations of fact. (*Crandall* v. *Parks,* 152 Cal. 772 [93 Pac. 1018]; *Herdan* v. *Hanson,* 182 Cal. 538 [189 Pac. 440]; *Neff* v. *Engler,* 205 Cal. 484 [271 Pac. 744]; *Williams* v. *Myers,* 110 Cal. App. 265 [294 Pac. 61]; *Winkler* v. *Jerrue,* 20 Cal. App. 555 [129 Pac. 804]; *Stumpf* v. *Lawrence,* 4 Cal. App.

(2d) 373 [40 Pac. (2d) 920].) ▮ These and many other cases that could be cited hold that when a statement as to value is made as a positive affirmation of a fact, and is intended as such by the party making it, and such statement is false and is known to be false by the person making it, and such statement is relied upon by the person to whom it is made, then such false statement is actionable. The cases also indicate that where there is a reasonable doubt as to whether a particular statement is an expression · of opinion or the affirmation of a fact, the determination rests with the trier of the facts. (*Vah Dah Dunshee* v. *Boadway,* 119 Cal. App. 678 [7 Pac. (2d) 325]; *McKeever* v. *Locke-Paddon Co.,* 58 Cal. App. 51 [207 Pac.· 1040]; *McElligott* v. *Freeland,* 139 Cal. App. 143 [33 Pac. (2d) 430]; *Hayward* v. *Widmann,* 133 Cal. App. 184 [23 Pac. (2d) 762].).

▮ It may be that, under the circumstances of this case, there is considerable doubt as to whether the representation that the bonds were "worth 100 cents on the dollar", standing alone, constitutes an affirmation of fact, but when that statement is considered in connection with the positive statement that the bank would lend $27,500 *on the bonds,* all such doubt disappears. This last assertion was a positive statement, which was false and which was known by Fox to be false when it was made. The bank was not willing to and did not, in fact, lend the sum mentioned on the bonds, but upon the contract of repurchase executed by the bond company. This statement was well calculated to mislead Willson as to the value of the bonds and gave substance to the assertion that the bonds were worth 100 cents on the dollar. Obviously, if the bank would lend over 30 per cent of the face value of the bonds, that would be some evidence of their value. Cotton and the bond company knew of this material misrepresentation made by Fox, because they saw and approved the escrow instructions, which were so drafted as to indicate that the bank was in fact making the loan on the bonds.

▮ It is next contended by all the appellants that Willson, through Hauschild, made an independent investigation as to the value of the bonds and, therefore, did not rely on the false representations made by Fox. This contention is based upon Hauschild's visit to San Diego over

July 4th to look over the property included in Districts 22 and 40. This visit was not made at Willson's request. Moreover, reading the evidence as a whole, it is quite apparent that Hauschild's inspection of the property was quite casual and that he was mainly interested in ascertaining that there actually were such districts and in ascertaining whether or not the districts were part of the "Romola deal". In the face of the implied findings of the jury, we cannot hold that such a casual and incomplete investigation bars respondent, as a matter of law, from relief. (*Sullivan* v. *Helbing*, 66 Cal. App. 478 [226 Pac. 803]; *Williams* v. *Myers*, 110 Cal. App. 265 [294 Pac. 61]; *Palladine* v. *Imperial Valley F. L. Assn.*, 65 Cal. App. 727 [225 Pac. 291]; *Gammon* v. *Ealey & Thompson*, 97 Cal. App. 452 [275 Pac. 1005]; *Neher* v. *Hansen*, 12 Cal. App. 370 [107 Pac. 565]; *Munn* v. *Earle C. Anthony, Inc.*, 36 Cal. App. 312 [171 Pac. 1082].)

The bond company and Cotton strenuously contend that there is no evidence that Fox was their agent. In fact, they contend that the evidence shows that he was Willson's agent. Fox urges that he was Willson's agent. It is urged that it was error to instruct the jury on the theory of agency, both because there is an absence of evidence to show agency, and because, so it is urged, agency was not pleaded. These points are all without merit. The complaint pleads agency in clear and unequivocal language. The complaint pleads both agency and a conspiracy to defraud. The evidence above quoted clearly sustains both theories. The fact that Fox was directed by Cotton and other officers of the bond company in all substantial details of the deal is clearly established. The fact that Cotton and other officials of the bond company actively participated in all of said transactions is clearly established by their acquiescence in permitting Fox to represent himself as the owner of the bonds and their acquiescence in the positive misrepresentations above discussed, appearing in the escrow instructions. The facts do not support the theory that Fox was Willson's agent. Willson testified, and the form of the contract demonstrates, that he believed that Fox was the owner of the bonds. How could it possibly be held that Fox, the other party to such a contract, was the agent of Willson? Appellants base their contention that Fox was Willson's

agent mainly upon the fact that the escrow instructions, as above stated, provided that Fox was to receive half the commission on the deal. This fact does not conclusively establish an agency. The evidence shows that this was an arrangement between Irwin and Fox, in which Willson acquiesced. The latter had to pay a full commission on the deal to Irwin, and what arrangements Irwin made to divide that commission was of no concern to Willson. It is also true that Willson in his deposition apparently inadvertently stated that Fox and Irwin were his agents, but his testimony and the testimony of the other witnesses at the trial clearly established that Fox was the agent of the other two appellants. At most the facts relied upon by appellants created but a conflict in the evidence. The jury, on substantial and conflicting evidence, has found in respondent's favor on this issue, and appellants are bound thereby.

█ Appellants have exhaustively briefed the question as to the nature of the bonds involved herein and, based on their analysis, contend that as a matter of law the implied finding of the jury that the bonds had no market value as of July 1, 1930, cannot be sustained. In fact, it is appellants' contention that Fox's statement that the bonds were worth 100 cents on the dollar, as a matter of law, was true. Experts in the bond business, called by respondent, testified that the bonds of Districts 22 and 40 could not have been sold at any price on July 1, 1930; that, on that date, there was no market at all for such bonds; that, on that date, they had no market value at all. Such testimony obviously supports the implied finding. The argument of appellants that the bonds constituted a "lien" on the lands within the district and that the lands must have had some value, and that, therefore, the bonds must have had some value, is not convincing. The bonds had no *market* value, because no one would buy them. The value of the lands within the districts was not pertinent to the market value of the bonds. Moreover, it was held by this court in *County of San Diego* v. *Childs,* 217 Cal. 109, 115 [17 Pac. (2d) 734], that, under the law existing when the bonds here involved were issued, "the bonds are not a specific lien upon the lots and parcels of land in the district. The bondholder must look for payment from the special fund main-

tained by the annual assessments. . . . The bondholder acquires his bond in the light of these statutory provisions.'' The cases cited by appellants have not established that these bonds are specific liens on the land. The statute expressly provides to the contrary.

We have carefully examined all the other points made by each of the appellants and find them without merit. They are so unsubstantial as not to require further discussion.

█ We are not unmindful of the fact that appellants Cotton and Municipal Bond Company produced strong evidence in this case tending to show their innocence of any wrongdoing. This evidence, if believed by the jury, would have been ample to sustain a verdict in their favor. The jury, however, on conflicting evidence, has seen fit to believe the evidence produced by respondent. Under such circumstances, this court is without power to disturb the judgment.

The judgment appealed from is affirmed.

Rehearing denied.