[S. F. No. 17048. In Bank. May 29, 1945.]

WALTER S. HOBART, Respondent, v. HOBART ESTATE COMPANY (a Corporation) et al., Appellants.

414

Arthur B. Dunne, Dunne & Dunne, Sloss & Turner, Allan P. Matthew, Robert L. Lipman and McCutchen, Thomas. Matthew, Griffiths & Greene for Appellants.

Vincent W. Hallinan and James Martin MacInnis for Respondent.

GIBSON, C. J.—This is an action for damages for loss resulting from alleged fraudulent representations through which plaintiff claims he was induced to sell 833⅓ shares of stock in the Hobart Estate Company at less than its true value. A verdict was rendered against defendants Greene and the Hobart Estate Company for actual damages, together with an award of exemplary damages against Greene. Defendants have appealed from the judgments entered on the verdict and from orders denying motions for judgment notwithstanding the verdict.

Walter S. Hobart, the grandfather of plaintiff, died in 1892, leaving his estate to his children, Walter S. Hobart (plaintiff's father), Alice Lester and Virginia Baldwin. The three children organized the Hobart Estate Company, a family corporation, transferring thereto substantially all the assets they had obtained from the estate. Prior to 1933 certain of the three original stockholders surrendered some of their stock to the company, leaving 38.010 shares outstanding. The law firm of McCutchen, Olney, Mannon and Greene, or its predecessors (hereinafter called the law firm), have represented the company since its inception.

In 1907 Alice Lester was declared incompetent and she has since been confined in an institution. E. J. McCutchen, a member of the law firm, was appointed guardian of her estate. Defendant Greene, a partner in the firm, subsequently became coguardian, and upon the death of McCutchen continued as sole guardian. The law firm has acted as attorney for the guardian. Since 1932 Greene has been president of the Hobart Estate Company, and he has also been its general manager and a director. He owned no stock other than one share to qualify him as a director.

In 1933 plaintiff's father, owing $240,000 to Alice Lester, settled the debt by selling 6,000 shares at $40 per share to the guardianship estate, which thereby obtained control of the

company. As guardian, Greene had the right to vote the stock.

Upon the death of plaintiff's father in November, 1933, a trust of 2,500 shares of the stock terminated and 833⅓ shares were distributed to each of his three children, namely, plaintiff, Ruth Hobart Crocker, and Hannah Neil Prince. The shares that were then received by plaintiff are the shares principally involved in this action.

Plaintiff's father left an estate consisting in part of 3,289 shares in the Hobart Estate Company. The will of plaintiff's father, drawn by the law firm, practically disinherited plaintiff, bequeathing him only $100. Greene was named co-executor and was one of the trustees under trusts created by the will. Plaintiff contested the will and in order to finance the litigation pledged his 833⅓ shares of stock with Charles Crocker.

Plaintiff first engaged Ralph Lachmund as his attorney and later substituted George Harris. Eugene Aureguy was employed by plaintiff as an investigator. In the will contest, filed in June, 1934, it was alleged that the will was the result of undue influence exerted by the legatees and also the executors, one of whom was Greene. In the summer of 1935, Harris and Aureguy discussed a settlement of the contest with J. M. Mannon, Jr., a partner in the law firm. Subsequently Mannon left on a vacation and turned the matter over to Greene.

According to plaintiff, Greene insisted as a condition of the settlement of the will contest that plaintiff sell his stock and represented that it was worth no more than $25 per share, whereas in truth it was worth much more, and that in reliance thereon plaintiff agreed to sell his stock at this price to a buyer then undisclosed by Greene and to accept $25,000 in settlement of the will contest. Defendants deny that any such representation was made and assert that under the actual agreement plaintiff was to be paid $55 per share for the stock and nothing for settlement of the will contest.

Greene sought and obtained permission of the superior court in the guardianship proceedings to buy the stock on behalf of the guardianship estate at $55 per share. It does not appear, however, that plaintiff knew who the actual purchaser was when the transaction was completed, and the documents executed at that time referred to the purchaser as the "nominee" of the law firm. Plaintiff received a pay-

ment of $45,833.15, a sum approximately equivalent to $55 per share for the 833⅓ shares. The receipt of this sum is also consistent with plaintiff's claim that he was paid $25 per share plus a lump sum of $25,000 for settlement of the contest. The transaction was not completed until January 16, 1936. Plaintiff remained in California for about three months. Thereafter he went to Europe, returning to New York in January, 1941, where, he testified, he received information from an unidentified person concerning the value of the holdings of the Hobart Estate Company. Two or three months later he came to San Francisco, consulted Aureguy and Harris, and obtained information which he testified was "excessively at variance" with the statements made to him by Greene relating to the value of the stock. The present action was filed in June, 1941.

Upon these appeals both defendants contend (1) that the evidence is insufficient to establish a cause of action for fraud, (2) that plaintiff as a matter of law is barred by the statute of limitations, (3) that the trial court committed prejudicial error in giving and refusing various instructions, and (4) that the verdict against Greene resulted from coercive pressure exerted by the trial court upon the jury. The Hobart Estate Company contends, further, that the evidence does not support an implied finding that Greene acted as its agent in making the alleged representations.

### I. *Sufficiency of Evidence of Fraud.*

In general, to establish a cause of action for fraud or deceit plaintiff must prove that a material representation was made; that it was false; that defendants knew it to be untrue or did not have sufficient knowledge to warrant a belief that it was true; that it was made with an intent to induce plaintiff to act in reliance thereon; that plaintiff reasonably believed it to be true; that it was relied on by plaintiff; and that plaintiff suffered damage thereby. In determining the sufficiency of the evidence to meet these requirements we must, in view of the verdict, resolve all conflicts in plaintiff's favor and draw all permissible inferences necessary to support the judgment.

The alleged representations were made during a series of four conferences with Greene concerning settlement of the will contest. Plaintiff was present at the fourth conference only, and at the others was represented by Aureguy and Harris, or by Aureguy alone.

Aureguy testified that at the first of these discussions Greene stated that the family wanted plaintiff out of the corporation and that it was necessary that plaintiff sell his stock in the Hobart Estate Company as a condition precedent to the settlement of the will contest. The second meeting, according to Aureguy, was between Greene, Harris and himself. At this conference no representations were made with respect to the value of the stock and there was no discussion of the terms upon which a settlement could be made. Aureguy testified that at the third conference Greene stated that his clients were willing to pay $25,000 to settle the will contest contingent upon plaintiff's selling the stock at $25 a share. Aureguy said he suggested a price of $40 a share and the settlement of the will contest for $25,000, but that Greene stated that the stock could not be sold at $40 a share, that the book value of the stock was $25 a share and that was all it was worth. Aureguy testified that in reply to his inquiry as to what was meant by "book value" Greene said: "If all the assets of the corporation were sold, and the expenses paid and the money divided, why each share of stock would not net in excess of $25 a share . . . it might realize less than that," and that Greene also said that the company "was in a bad financial condition," that "we are in very trying times," and that "The corporation owes money on its various holdings, and if the loans were called, the corporation would be in very bad position. Whether we would be able to pay them or not, I don't know."

Plaintiff, Harris, Aureguy, and Greene were present at the fourth conference. Plaintiff had never before met Greene. With respect to this conference plaintiff and Aureguy testified in substance as follows: Aureguy started the conversation, saying that he had brought plaintiff to have Greene confirm what he had said at the prior conference. Aureguy asked Greene if it were essential that plaintiff part with his stock in order to settle the will contest. Greene replied: "Yes, most definitely." Plaintiff protested, saying he had wanted to establish a trust with the stock for his daughter. Greene, however, insisted there could be no settlement without the sale. Aureguy summarized what had been said at the prior conference with respect to the value of the stock, mentioning the figure given by Greene of $25,000 to settle the contest and the fact that Greene had a buyer who was willing to pay $25 per share, but no more, for the stock. Plaintiff

stated that he had thought the stock worth $100 or more per share. He asked how it could be worth only $25 when a year or so before it had been appraised at $40 in his father's estate. Greene replied that the appraisal of $40 was based upon the prior sale at that price by plaintiff's father to the estate of Alice Lester; that plaintiff's father was paid more than the stock was worth; and that the appraisal did not, therefore, represent the value of the stock. Greene said, "The stock is not worth over $25 a share."

Plaintiff and Aureguy further testified that Greene explained that the Hobart Estate Company was a family corporation and its stock had no market value; that the company was in very bad financial condition and that its assets had been declining in value; that it owed a great deal of money and if it became necessary to liquidate any of the property to satisfy a loan or if there were a forced sale of all the stock, it might be worth even less than $25 a share; and that "due to the assets and liabilities approaching one another rapidly, the stock was in jeopardy and it was just as well to sell the stock." It was also testified that Greene said that there was nothing he did not know about the financial situation, the net assets or the liabilities of the company, that he knew more about the corporation than anybody else, that if Aureguy sought information anywhere, he would ultimately come to Greene for it, that Greene assured plaintiff that he had only the kindliest feelings toward him and that he wanted him to get all he possibly could out of the stock but that he could not in fairness suggest that anyone pay more than $25 a share for it.

Harris, called as a witness by plaintiff, testified that he had been employed by plaintiff in connection with the will contest, but not to sell the stock, and that the total sum of $45,833.15 received "was an over-all figure involving the settlement of all aspects of the case . . . there were two phases: the stock aspect and the will contest . . . and the contest could not be settled without the relinquishment of . . . [plaintiff's] right to the stock . . . the stock transaction was integrated with the will contest." With regard to the fourth conference, at which plaintiff was present, Harris testified that he could not recall all of the conversation, but said that Greene did discuss declining values, the depressed condition of things and painted a rather depressing picture of the affairs at that time. Harris had no recollection as to whether or not Greene gave any opinion of the value of the stock.

Plaintiff testified that Harris asked him if he wished to take Greene's word or investigate the matter further, and that plaintiff replied: "I am certain a man of Mr. Greene's integrity and position would never state anything in regard to it that was not so, and I will take his word."

Plaintiff also testified that he had heard Crocker say, in connection with the pledge transaction, that the stock was worth only about $24 per share; that he was doubtful of the statement then, but that from what Greene said he "finally believed that the stock was only worth $25.00"; and that he sold it at $25 "because at the time Mr. Greene said it was worth that." He also testified that before his conversation with Greene he had not wanted to sell the stock but that Greene convinced him he should.

Greene testified that at the first conference the transaction was discussed on the basis of a prior talk by Harris and Aureguy with Mannon, in which, according to Mannon, plaintiff offered to settle if he could get $40 per share for the stock, together with something for the will contest, the total being about $48,333. Greene said that both the sale by plaintiff's father at $40 and the inheritance tax appraisal at that figure were discussed. He testified he told Aureguy that the figure of $40 had been given by the law firm to the inheritance tax appraiser because the only record of a sale of the stock was at $40 a share. He said the depression was one of the main topics of the conversations and admitted saying at the conferences that there was no market for the stock. He testified that such was the fact because in order to have a market there must be trading.

Greene denied that he represented the stock to be worth only $25 a share and denied saying that plaintiff must part with his stock in order to settle the will contest but admitted he had considered plaintiff a troublemaker and a storm center in the company and that he believed it to be in the best interests of the shareholders and the company to eliminate plaintiff as a stockholder. Greene testified that he did not represent that the company was in bad financial condition. He denied that there was any agreement to purchase the stock at $25 a share or to settle the will contest for $25,000.

Before discussing the sufficiency of the evidence to establish a cause of action for fraud, it should be noted that defendants do not dispute the actual falsity of the principal representations, if made. Greene alleged in his petition filed

in the guardianship proceedings in January, 1936, that the stock was reasonably worth $55 per share and he testified in the present action that it was worth $55 at the time of the transaction and that he then believed it to be worth that amount. He said it was not a fact that the assets were very bad or that the assets and liabilities were closely approaching each other. There was testimony by several witnesses as to the actual value of the assets and stock of the company at those times, and it is not claimed that the *amount* of damages awarded by the jury (necessarily based upon this testimony) was excessive.

In arguing that the evidence is insufficient to establish fraud, and that plaintiff could not reasonably have relied upon Greene's statements, defendants assert that the testimony of plaintiff and Aureguy is so inherently improbable it cannot be believed; that the alleged representations, as qualified by Greene, were merely statements of opinion; that there was no fiduciary relationship between Greene and plaintiff and in the absence thereof plaintiff was not entitled to rely upon the representations; that plaintiff made an independent investigation of the value of the stock and relied upon such investigation and upon his advisers rather than upon Greene's representations; and that certain information concededly known to plaintiff or his agents put him on inquiry.

In support of the argument that the testimony of plaintiff and Aureguy is incredible and their version of the transaction inherently improbable, defendants cite a number of instances in which plaintiff's evidence is assertedly inconsistent and unreasonable. Unless in the light of the circumstances the testimony is so inherently improbable and impossible of belief as in effect to constitute no evidence at all, it may not be disregarded in determining the sufficiency of the evidence to support the judgment.

Defendants insist that the testimony that the total sum paid consisted of $25,000 for the settlement of the will contest and only $25 per share for the stock is inconsistent with certain letters and documents prepared contemporaneously with the completion of the transaction and is therefore inherently improbable. They urge that these papers show beyond question that $55 was paid for the stock and nothing for the contest. The first of the letters was dated November 29, 1935, and was sent by plaintiff's attorney, Harris, to the attorney for Charles Crocker, pledgee of the stock, to inform Crocker of the proposed plan to sell the stock and settle the

will contest. It read, in part: ". . . it was agreed that in consideration of our client dismissing with prejudice the pending will contest and tendering a full and complete release in and with respect to any rights and/or claimed rights in and to said estate, and in addition transferring to the nominee of the representatives of the estate eight hundred and thirty three and one-third (833-⅓) shares of stock of the Hobart Estate Company standing in the name of Walter S. Hobart, Jr., the representatives of the estate would pay therefor and in consideration thereof $55.00 a share for the said eight hundred and thirty three and one-third (833-⅓) shares. In short, the settlement contemplated not only a dismissal of the will contest but also a complete relinquishment of all the right, title and interest of our client in and with reference to said shares of stock."

The law firm prepared certain documents including (1) a dismissal and retraxit of the will contest, (2) a stock transfer and power of attorney, and (3) a release to be executed by both plaintiff and Crocker. These documents and others, including the stock certificates, were delivered in escrow. On January 14, 1936, Harris wrote a letter to the law firm reading as follows: "In accordance with our understanding for the purchase by you, or your nominee, of 833⅓ shares of the capital stock of the Hobart Estate Company, at the agreed price of $55.00 a share, together with a full and complete settlement of all of the interest of Walter S. Hobart, Jr., in the estate of his late father, I have deposited with Mr. Daniel J. Murphy, Vice President, Crocker First National Bank, this city, all of the documents which you have handed to me, properly executed, pursuant to your instructions. These papers have been deposited by me under appropriate instructions, and I trust that the only thing remaining to be done, to wit, the payment of $45,833.15 will be made forthwith."

The documents deposited by Harris in escrow included a letter of instructions, signed by plaintiff, with Aureguy and Harris as witnesses, reading in part: "The said certificate for 833⅓ shares I have agreed to sell to a purchaser represented by the law firm of McCutchen, Olney, Mannon & Greene, for the total of $45,833.15, representing 833⅓ shares at $55 per share."

We cannot hold as a matter of law that the contemporaneous letters and documents relating to the form of the transaction compel a conclusion that the money plaintiff received

was solely for the stock and that no part of it was paid in settlement of the will contest. The letter from Harris to Crocker's attorney stated that plaintiff was to receive $55 per share *in consideration of dismissing the will contest* as well as for transfer of the stock. The letter from Harris to the law firm on January 14, 1936, recited the contest settlement as a part of the transaction. The jury could have inferred from these papers, together with the other evidence in the case, that at least some portion of the sum paid was based upon dismissal of the contest, and, in any event, they are reconcilable with plaintiff's version of the transaction. Although the letter containing the escrow instructions referred to a purchase of stock alone without mention of settlement of the contest, it is undisputed that one of the documents placed in escrow for delivery to the proponents of the will, was a dismissal and retraxit of the contest that was prepared by the law firm and required of plaintiff by Greene as a condition essential to completion of the transaction.

Furthermore, the form of the transaction, that is, its repeated description as a sale of the stock at $55 per share, was explained by plaintiff, Aureguy, and Harris as a matter insisted upon by Greene. Plaintiff testified that Greene stated during the last conference that: "In selling the stock and the whole thing, of course, you realize that according to the trust that we drew up in your father's will it is absolutely impossible to pay you out of his estate. What we will do is this: I will contact my purchaser, and if he is willing to pay $25.00 a share, why, then, we will add to that $25,000 as settlement of the will contest, and we wish to make it in the form of a stock transaction which will then look as though you were being paid a nominal sum of $55.00 a share for your stock." According to Aureguy, Greene stated during one of the conversations that "to assuage the feelings of the family, and so there will be no scheming upon the fact with respect to the allegations" in the will contest, it would be necessary to pay the money in such a manner "that it will appear that the stock was sold for . . . $55 a share." When Harris was asked if he remembered "the arrangements under which the whole thing was made to appear as though it were $55 a share for the stock," he testified that "to the best of my recollection . . . the transaction could only be handled in that fashion . . . there was considerable feeling, as I recall, as between certain members of the family, certain warring factions between the Hobarts and the Crockers, and others, and

my recollection is that the record under no condition could show or should show any payment directly in connection with this will contest. . . .'' When asked if the amount of the will contest was added on to what was being paid for the stock, he replied: ''One was integrated with the other,'' adding that he thought this fact was clearly shown in his letter of November 29, 1935, to Crocker's attorney. The jury, believing the testimony of plaintiff and Aureguy, could have inferred that Greene, in order to facilitate the transaction, insisted that it take the form of a sale of stock at $55 per share, although in fact $25 per share was paid for the stock and $25,000 for the settlement of the will contest.

Defendants assert that if plaintiff's evidence relating to the form of the transaction is to be believed, plaintiff knowingly participated in a scheme which was calculated to enable an improper advantage to be taken of someone, in which event plaintiff would be *in pari delicto* with Greene and no court would aid plaintiff in escaping the consequences of his own wrongdoing. (Cf. *American T. Co.* v. *California etc. Ins. Co.*, 15 Cal.2d 42, 66 [98 P.2d 497], where this court stated it to be a general principle that ''an *agreement to defraud third persons* is illegal and void.'') Defendants also argue that for this reason the testimony of plaintiff and Aureguy is unworthy of belief. To show that Aureguy was aware of such a scheme defendants point to his testimony that it was his opinion that if the transaction were made to appear to be a sale at $55 a share, that would be ''indulging in a little duplicity.'' Defendants also refer to plaintiff's testimony that he thought it was rather extraordinary the purchasers wanted to arrange it that way, but that it was their affair. Defendants urge that if this testimony was true plaintiff was put on notice of an intent to deceive someone and that he cannot now complain if he was the one who was deceived. In the present case, however, there was no contract to defraud a third person within the meaning of the American Trust Company case, and it is not established that Greene, to plaintiff's knowledge, contemplated defrauding the purchaser of the stock.

We have considered other portions of the record which defendants assert show that the testimony of plaintiff and Aureguy is incredible and unworthy of belief but we cannot say as a matter of law that the testimony contains

such evidentiary weakness or abnormality as to render it inherently improbable.

Defendants next contend that all of the representations were expressions of opinion, rather than of fact, and therefore, are not actionable. This court has said, however, that "bearing in mind that an expression of an opinion, if honestly made, is an expression of what the speaker *believes to be* a fact, it becomes apparent that by the expression of a dishonest opinion to one entitled to rely upon it, deceit is practiced, injury may be worked, and an action will lie." (*Edward Barron Estate Co.* v. *Woodruff Co.*, 163 Cal. 561, 573 [126 P. 351, 42 L.R.A.N.S. 125]; see, also, 23 Am.Jur. 789-791, and 37 C.J.S. 237, stating that this view represents the weight of authority.) In *Neff* v. *Engler*, 205 Cal. 484 [271 P. 744], and in *MacDonald* v. *de Fremery*, 168 Cal. 189 [142 P. 73], the rule was applied to false statements of value of corporate stock and financial condition. In the MacDonald case the court said (p. 199): "But an expression of an opinion, to avoid an action for deceit, must be the expression of an opinion honestly entertained by the person making it." In the Restatement, Torts, section 525, Comment b, it is said: ". . . A representation of the state of mind of the maker or of a third person is a misrepresentation if the state of mind in question is otherwise than as represented. Thus, a statement that a particular person, whether the maker of the statement or a third person, is of a particular opinion . . . is a misrepresentation if the person in question does not hold the opinion . . . asserted." The principal false statement attributed to Greene was that the stock in the Hobart Estate Company was not worth more than $25 a share. Greene denied making any representation as to the value of the stock but admitted that, although he did not say so, he then believed it was worth $55 a share.

Defendants cite authorities for the proposition that a statement of value which is professedly given and received only as an opinion will not support a charge of fraud. (See cases cited in 12 Cal.Jur. 726-729.) They urge that the present case falls within this rule because, according to the testimony of plaintiff and Aureguy, certain qualifications were placed by Greene upon his statements of value which made it clear that they were mere expressions of opinion.

Most of the asserted qualifications were made during the second or third conference. They are as follows: Greene

told Aureguy that the only figure he was able to furnish with respect to the value, in the absence of a piece by piece appraisal of the assets of the company, was the sale by plaintiff's father to the Lester estate at $40 per share. Greene explained, however, that the price at which this sale was made "represents a figure vastly in advance of what the stock is worth." Greene also said that he had no way of determining values except by actual sales; that he was unable to determine the value of the stock because the only figure he ever had was the sale by plaintiff's father; that he had no way of definitely knowing what it was worth; that the stock was not generally dealt in and was worth "just what any person will pay for it or . . . whatever Mr. Hobart can get for it"; that "the only way we can arrive at the value of a corporation of this character would be to sell the assets and divide the money." At the commencement of the fourth conference, which plaintiff attended, Aureguy repeated the substance of the prior conference with Greene, stating that Greene had informed him that to arrive at the value of the stock it would be necessary to sell all the assets.

When the record is read as a whole it appears that the jury could properly have found that these statements, instead of being made as qualifications, were intended by Greene to show the difficulty of ascertaining the true value, thereby discouraging further investigation by plaintiff and inducing him to rely upon the representations of value. Moreover, there was testimony that, subsequent to the making of the qualifications, Greene made positive representations that the stock was worth no more than $25 a share and plaintiff expressed a willingness to take Greene's word as to its value.

Under some circumstances, at least, a positive representation of value may be treated as an assertion of an existing fact. In *Willson* v. *Municipal Bond Co.*, 7 Cal.2d 144, 151 [59 P.2d 974], the court said that "when a statement as to value is made as a positive affirmation of a fact, and is intended as such by the party making it, and such statement is false and is known to be false by the person making it, and such statement is relied upon by the person to whom it is made, then such false statement is actionable. The cases also indicate that where there is a reasonable doubt as to whether a particular statement is an expression of opinion or the affirmation of a fact, the determination rests with the trier of the facts." (See, also, *Bedell Engineering Co.* v. *Rouse*,

432

57 Cal.App.2d 734 [135 P.2d 404]; 37 C.J.S. 336-340; *cf. Wells* v. *Lloyd,* 6 Cal.2d 70, 87 [56 P.2d 517]; *Harris* v. *Miller,* 196 Cal. 8, 13-14 [235 P. 981].)

One of the factors to be considered in determining the character of statements of value and the right to rely thereon is whether or not they are accompanied by other false representations. (See *Edmonds* v. *Wilcox,* 178 Cal. 222, 224 [172 P. 1101]; *cf. Neff* v. *Engler,* 205 Cal. 484 [271 P. 744].) Here there is testimony that Greene made false statements with respect to the assets and liabilities of the company and its financial condition.

■ There is a further reason why plaintiff was entitled to rely upon Greene's statements concerning the value of the corporation's stock. Plaintiff was a stockholder in a company of which Greene was a director, president and general manager. In addition, as guardian of the estate of Alice Lester, he held a majority of the shares and the voting control of the stock, giving him the right to select most if not all of the directors and indirectly the right to determine all company policy and practice. He had been connected with the company for many years; he had an intimate knowledge of the company's affairs, its assets, its prospects, and all other factors affecting the value of its stock. Moreover, and of particular importance, the company was a closely held family corporation, and as will appear hereinafter, the books of the company, to plaintiff's knowledge, contained inaccurate valuations of the company's assets so that it would have been impossible for plaintiff to have ascertained the true value of his stock from this source. The stock was not dealt in on the market and the judgment of its value had to be made not from published stock transactions but from the information of one familiar with the facts, and in this connection Aureguy testified that Greene told him that if he sought information any place, he would ultimately come to Greene for it as there was no other source from which it could be obtained. Plaintiff, on the other hand, testified that he was not familiar with the affairs of the corporation or with financial matters in general.

The foregoing circumstances are sufficient to bring this case within the rule that where an officer or a director of a corporation has knowledge of special facts affecting the value of its stock, he cannot deal with a stockholder at arm's length but is under a duty to disclose such facts before making a

purchase or sale of the stock. This doctrine is explained in *American T. Co.* v. *California etc. Ins. Co.*, 15 Cal.2d 42, 57 [98 P.2d 497], where the conflicting views of the various jurisdictions on the existence of a fiduciary duty of a director toward stockholders are fully set forth. It was not necessary in that case to rely upon this doctrine, but its soundness is evident from the discussion therein. The contrary rule, which denies the existence of any fiduciary duty in the case of an officer having knowledge of special facts that enable him to profit at the expense of a shareholder by the use of information obtained in his official capacity, is not in accord with accepted principles of justice and must be rejected.

Under the "special facts" doctrine a corporate officer owes a limited fiduciary duty in transactions with a shareholder involving the transfer of stock. The confidential relationship arises as a result of the officer's possession of special knowledge gained in his capacity as a corporate fiduciary. An officer, in buying or selling to a shareholder, must inform him of those matters relating to the corporate business of which the officer has knowledge and which the shareholder has a right to know about, so that the latter may have the benefit of such information in judging the advantages of the deal. Once such disclosure is made, the officer has fulfilled his duty under this doctrine, and the resulting bargain is not subject to disaffirmance on the ground of unfairness to the shareholder. But without such disclosure the fiduciary duty of the officer in such a situation is not discharged.

It would be illogical to impose liability for silence while excusing deliberate false representations, and it follows that the officer owes a duty of complete honesty in any disclosure which he makes, regardless of whether his statements are classed as "facts" or "opinions." Coming to the case at hand, Greene, as president of the corporation, had a duty to disclose to plaintiff any special facts, of which he had knowledge, affecting the value of the stock and, in representing what the shares were worth, to state what he honestly believed to be the fact. If Greene deliberately gave plaintiff false information concerning the financial condition of the company or if he told him the stock was not worth more than $25 a share when he believed its value to be $55 a share, then he violated the duty which he owed to plaintiff.

On a further, though related, theory the statements attributed to Greene may be actionable. This court has held

that a false statement of opinion fraudulently made may form the basis of an action where the party making it possesses superior knowledge or special information regarding the subject matter of the representation. (*Union F. Market* v. *Southern Cal. F. Market,* 10 Cal.2d 671, 676 [76 P.2d 503]; see 37 C.J.S. 336-340.)

Defendants contend that because of certain undisputed evidence, Greene could not possibly have occupied a fiduciary or confidential or superior position with respect to plaintiff. They also urge that the facts shown by this evidence destroyed plaintiff's right to rely upon any representations of Greene and, further, put him on notice of possible fraud. First, defendants point to the will contest then pending, wherein plaintiff charged the executors, including Greene, and the legatees with fraud and undue influence. The fiduciary position and superior knowledge of Greene existing prior to the filing of the will contest were not ipso facto terminated because plaintiff charged Greene with improper conduct toward a third person. Greene's superior knowledge obviously remained unchanged, and his duty of fair dealing toward plaintiff as a stockholder did not cease when he and plaintiff became adversaries in a legal proceeding. Nor can we say as a matter of law that the allegations made by plaintiff in the will contest evidenced a relationship of hostility and a lack of trust and confidence which deprived plaintiff of the right to rely upon representations made by Greene in subsequent negotiations. The meeting at which the representations were claimed to have been made by Greene occurred more than a year after the contest was filed. Plaintiff testified he then expressed his confidence in Greene's honesty and his willingness to take Greene's word as to the condition of the company and the value of the stock. The jury had a right to infer that any beliefs or doubts plaintiff may have had when the will contest was filed concerning Greene's integrity had been changed or entirely dispelled at the time the representations were made.

■ Defendants next claim that the evidence shows that plaintiff, Lachmund, and Aureguy made investigations of the value of the Hobart Estate Company's assets and stock, and they contend that one who has conducted an independent investigation must be deemed to have relied thereon rather than upon any representations made to him. (*Cf. Carpenter* v. *Hamilton,* 18 Cal.App.2d 69 [62 P.2d 1397]; *Blumenthal*

v. *Greenberg,* 130 Cal. 384 [62 P. 599] ; *Colton* v. *Stanford,* 82 Cal. 351 [23 P. 16, 16 Am.St.Rep. 137].) A defrauded person, however, is not barred from maintaining an action merely because he commenced an investigation if it was incomplete or abandoned before discovery of the falsity, particularly if the defendant has a superior knowledge of the facts, or if it is difficult for the plaintiff to ascertain all the facts or he is not competent to judge the facts without expert assistance. (See, for example, *Shearer* v. *Cooper,* 21 Cal.2d 695, 702, 704 [134 P.2d 764] ; *French* v. *Freeman,* 191 Cal. 579, 587-588 [217 P. 515] ; *Payne* v. *Clow,* 114 Cal.App. 597, 600-601 [300 P. 138] ; *Willson* v. *Municipal Bond Co.,* 7 Cal.2d 144, 151-152 [59 P.2d 974] ; 37 C.J.S. 286-288.) Expert witnesses testified that in order to determine the value of the stock it would be necessary to make a complete examination and appraisal of all the assets of the company, which consisted of several city buildings, mining property, timber land, a public utility plant, and numerous other holdings. The evidence clearly shows that it was difficult to secure the information necessary to form an accurate estimate of the value, that Greene had superior knowledge concerning these facts, and that plaintiff was not competent without expert assistance to determine what the stock was worth. The evidence does not establish that Lachmund, Harris or Aureguy were qualified to give such assistance or that they attempted to advise plaintiff with respect thereto. Moreover, there was evidence that plaintiff did not make a complete investigation because of his reliance upon Greene's representations. (See *Shearer* v. *Cooper, supra,* 21 Cal.2d 695, 704; *Divani* v. *Donovan,* 214 Cal. 447, 453 [6 P.2d 247].)

■ Defendants contend that certain facts known to plaintiff should have aroused his suspicions and precluded his reliance upon the representations assertedly made by Greene. It appears that the proponents in the will contest took the deposition of Howard G. Stevenson, secretary of the company, and that Lachmund was present as attorney for plaintiff and inquired of Stevenson concerning the value of the company's assets and examined copies of the balance sheets of the company for the years 1932, 1933, and 1934, which listed all the assets and liabilities of the company. Defendants argue that having acquired this information through his attorney, plaintiff could not rely upon Greene's representations of value. According to Stevenson's deposi-

tion, the valuations placed upon many of the principal corporate assets were carried on the books unchanged from as early as 1915 and did not reflect actual values or changes in value due to the depression. He said that some of the properties were worth the book value, some were worth only one-tenth of the book value and some were not worth anything. He further stated that a determination of the actual value would require reappraisal of the properties. There was testimony that Greene told Aureguy "that they were carrying on their books certain properties which were vastly in excess of the real value of the properties," and that during the conferences Greene pointed out that as a result of various factors such as the depression, the net worth was less than that shown by the financial statements of the company. According to the balance sheets, the book value of the stock was approximately $120 per share, whereas Greene testified he then believed the stock was worth but $55 a share. Greene further testified in substance that the assets were worth less than shown by the figures on the balance sheets. It is obvious that the balance sheets did not fairly represent the actual value of the corporate assets and that plaintiff had been so informed. It cannot therefore be said, as a matter of law, that plaintiff was prevented from accepting the representations of Greene as true because of the difference in the value of the stock as shown by the books and as represented by Greene.

In our opinion the evidence, when considered as a whole and construed most favorably to plaintiff, is sufficient to establish all of the essential requirements of a cause of action for damages for fraudulent representations.

## II. *Statute of Limitations.*

Defendants contend that this action is barred by section 338 of the Code of Civil Procedure which provides a three-year period of limitations for commencement of: "An action for relief on the ground of fraud or mistake. The cause of action in such case not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." The conferences at which Greene is claimed to have made false representations were held in the latter part of 1935, and the transaction based thereon was completed in January, 1936. The present action, however, was not commenced until June, 1941, more than five years after the alleged fraud took place.

The provision tolling operation of the statute until discovery of the fraud has long been treated as an exception and, accordingly, this court has held that if an action is brought more than three years after commission of the fraud, plaintiff has the burden of pleading and proving that he did not make the discovery until within three years prior to the filing of his complaint. (See *Sublette* v. *Tinney* (1858), 9 Cal. 423; *Lady Washington C. Co.* v. *Wood,* 113 Cal. 482 [45 P. 809]; *Consolidated R. & P. Co.* v. *Scarborough,* 216 Cal. 698 [16 P.2d 268]; *Knapp* v. *Knapp,* 15 Cal.2d 237, 242 [100 P.2d 759].) Further, although negligence by the person defrauded is not a defense to a promptly brought action based upon intentional misrepresentation (see *Seeger* v. *Odell,* 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291]), the cases construing section 338, subdivision 4, *supra,* have held that plaintiff must affirmatively excuse his failure to discover the fraud within three years after it took place, by establishing facts showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry. (See *Johnson* v. *Ehrgott,* 1 Cal.2d 136, 137 [34 P.2d 144]; *Original Min. & Mill. Co.* v. *Casad,* 210 Cal. 71, 74 [290 P. 456]; *Del Campo* v. *Camarillo,* 154 Cal. 647, 657 [98 P. 1049].)

Defendants assert that in addition to these requirements plaintiff must show that he made a diligent inquiry to discover whether or not he had been defrauded, and they argue that plaintiff failed to prove that earlier inquiry would not have revealed the falsity of the alleged representations. It is not in every case, however, that a person is barred after three years by failure to pursue an available means of discovering possible fraud. The statute commences to run only after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry. Section 19 of the Civil Code provides: "Every person who has actual notice of circumstances *sufficient to put a prudent man upon inquiry* as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact." (Italics added.) Under this section it was held in *Tarke* v. *Bingham,* 123 Cal. 163 [55 P. 759], that the plaintiff was not barred by subdivision 4 of section 338 of the Code of Civil Procedure, since nothing had occurred "to excite his suspicion, or to put him upon inquiry." (123 Cal. at p. 166.)

The court said: "Where no duty is imposed by law upon a person to make inquiry, and where under the circumstances 'a prudent man' would not be put upon inquiry, the mere fact that means of knowledge are open to a plaintiff, and he has not availed himself of them, does not debar him from relief when thereafter he shall make actual discovery. *The circumstances must be such that the inquiry becomes a duty, and the failure to make it a negligent omission.*" (Italics added.) Many other decisions have adopted this view. (See *Mary Pickford Co.* v. *Bayly Bros., Inc.,* 12 Cal.2d 501, 511 [86 P.2d 102]; *Original Min. & Mill. Co.* v. *Casad,* 210 Cal. 71, 76 [290 P. 456]; *Prewitt* v. *Sunnymead Orchard Co.,* 189 Cal. 723, 730 [209 P. 995]; *Victor Oil Co.* v. *Drum,* 184 Cal. 226, 241 [193 P. 243]; *Lady Washington C. Co.* v. *Wood,* 113 Cal. 482 [45 P. 809]; *West* v. *Great Western Power Co.,* 36 Cal.App.2d 403, 406, et seq. [97 P.2d 1014]; *Denson* v. *Pressey,* 13 Cal.App.2d 472 [57 P.2d 522]; *Edwards* v. *Sergi,* 137 Cal.App. 369 [30 P.2d 541]; *cf. Smith* v. *Martin,* 135 Cal. 247, 254-255 [67 P. 779].) ▆ In many cases it has been said that means of knowledge are equivalent to knowledge. (See *Shain* v. *Sresovich,* 104 Cal. 402, 405 [38 P. 51]; *People* v. *San Joaquin etc. Assn.,* 151 Cal. 797, 807 [91 P. 740]; *Consolidated R. & P. Co.* v. *Scarborough,* 216 Cal. 698, 701, et seq. [16 P.2d 268]; *Knapp* v. *Knapp,* 15 Cal.2d 237, 242 [100 P.2d 759]; *Bainbridge* v. *Stoner,* 16 Cal.2d 423, 430 [106 P. 2d 423]; *Merrill* v. *Los Angeles Cotton Mills, Inc.,* 120 Cal. App. 149, 158 [7 P.2d 329]; *Daily Tel. Co.* v. *Long Beach Press Pub. Co.,* 133 Cal.App. 140, 143-147 [23 P.2d 833]; *Wheaton* v. *Nolan,* 3 Cal.App.2d 401, 403 [39 P.2d 457]; *Haley* v. *Santa Fe Land Imp. Co.,* 5 Cal.App.2d 415, 420, 423 [42 P.2d 1078]; *Vertex Inv. Co.* v. *Schwabacher,* 57 Cal. App.2d 406, 415-418 [134 P.2d 891]; *Bryan* v. *Nicolas,* 67 Cal.App.2d 898 [155 P.2d 835]; *cf. Truett* v. *Onderdonk,* 120 Cal. 581, 589 [53 P. 26]; *Phelps* v. *Grady,* 168 Cal. 73, 79-80 [141 P. 926]; *Malone* v. *Clise,* 18 Cal.App.2d 154, 157 [63 P.2d 321].) This is true, however, only where there is a duty to inquire, as where plaintiff is aware of facts which would make a reasonably prudent person suspicious. In the Lady Washington case, the court said (113 Cal. at p. 487) that "as the means of knowledge are equivalent to knowledge, *if it appears that the plaintiff had notice or information of circumstances which would put him on an inquiry* which, if followed, would lead to knowledge, or that the facts were

presumptively within his knowledge, he will be deemed to have had actual knowledge of these facts.'' (Italics added.)

The reason for the rule is well stated in *Victor Oil Co.* v. *Drum, supra* (184 Cal. at p. 241): ''The courts will not lightly seize upon some small circumstance to deny relief to a party plainly shown to have been actually defrauded against those who defrauded him on the ground, forsooth, that he did not discover the fact that he had been cheated as soon as he might have done. It is only where the party defrauded should plainly have discovered the fraud except for his own inexcusable inattention that he will be charged with a discovery in advance of actual knowledge on his part.'' It follows that plaintiff is not barred because the means of discovery were available at an earlier date *provided* he has shown that he was not put on inquiry by any circumstances known to him or his agents at any time prior to the commencement of the three-year period ending June, 1941.

The record in this case contains a most complete presentation of all relevant circumstances that might have a bearing upon this question up to and including the completion of the transaction in January, 1936. Most of these factors have been discussed heretofore in connection with the sufficiency of the evidence to establish a cause of action for fraud. The problems there considered, however, did not directly concern ordinary *negligence* by plaintiff, since this would not be a defense to an action based upon intentional misrepresentation. (See *Seeger* v. *Odell*, 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291].) Accordingly, we must now determine whether plaintiff has brought himself within the exception to the statute of limitations. Plaintiff's evidence, if believed, disclosed certain factors that may have tended to discourage the making of an exhaustive independent investigation, and we cannot hold, as a matter of law, that any of the circumstances known to plaintiff should have put a reasonably prudent man upon inquiry. The jury could have found that Greene's representations were of such a nature as to lull plaintiff into a sense of security or state of inaction,—an important factor to be considered in determining whether or not plaintiff was negligent in failing to investigate. (See, for example, *Denson* v. *Pressey*, 13 Cal.App. 2d 472, 476 [57 P.2d 522]; *Edwards* v. *Sergi*, 137 Cal.App. 369 [30 P.2d 541].)

Another pertinent factor is that there was a fiduciary rela-

tionship between the parties at the time of the fraudulent representations. ▇▇▇ Although the general rules relating to pleading and proof of facts excusing a late discovery of fraud remain applicable, it is recognized that in cases involving such a relationship facts which would ordinarily require investigation may not excite suspicion, and that the same degree of diligence is not required. In *Rutherford* v. *Rideout Bank*, 11 Cal.2d 479, 486 [80 P.2d 978, 117 A.L.R. 383], it was said that because of such a relationship plaintiff could not be charged with lack of diligence even though an inquiry would have disclosed the true value of the property involved. (See, also, *Bainbridge* v. *Stoner*, 16 Cal.2d 423, 430 [106 P.2d 423] ; *Knapp* v. *Knapp*, 15 Cal.2d 237, 242 [100 P.2d 759] ; *Lataillade* v. *Orena*, 91 Cal. 565 [27 P. 924, 25 Am.St.Rep. 219] ; *Laraway* v. *First Nat. Bk. of La Verne*, 39 Cal.App.2d 718 [104 P.2d 95] ; 12 Cal.Jur. 799; (1942) 30 Cal.L.Rev. 589, 591; *cf. Marston* v. *Simpson*, 54 Cal. 189; *Edward Barron Estate Co.* v. *Woodruff Co.*, 163 Cal. 561, 575-577 [126 P. 351, 42 L.R.A.N.S. 125].) Defendants argue that the fiduciary relationship terminated when the sale was completed and that plaintiff was no longer entitled to the benefit of the rule. ▇▇▇ The relationship, nevertheless, did exist at the time of the asserted fraud, and plaintiff was under no duty to make a complete search and re-examination of the entire transaction immediately after it took place merely because the fiduciary relationship between the parties was terminated thereby. Under these circumstances, it was for the jury to determine whether it was negligence for plaintiff, after completion of the transaction, to continue to rely upon the representations that were made while he was a stockholder.

▇▇▇ Defendants contend, however, that certain facts indisputably known to plaintiff were sufficient to put him on inquiry. These contentions must be examined in the light of the rule announced in *Northwestern P. C. Co.* v. *Atlantic P. C. Co.*, 174 Cal. 308, 312 [163 P. 47]. The court there said that when the facts are susceptible to opposing inferences, whether "a party has notice of 'circumstances sufficient to put a prudent man upon inquiry as to a particular fact,' and whether 'by prosecuting such inquiry, he might have learned such fact' (Civ. Code, § 19), are themselves questions of fact to be determined by the jury or the trial court." (See, also, *West* v. *Great Western Power Co.*, 36 Cal.App.2d 403, 411

[97 P.2d 1014] ; 20 Cal.Jur. 240.) The facts mentioned by defendants have been discussed and analyzed heretofore in connection with the contention that the evidence is insufficient to establish either actionable misrepresentation or plaintiff's reasonable reliance thereon, and we shall not repeat them here. Although the jury could properly have concluded that knowledge of these facts and others urged by defendants should have put a prudent man on inquiry, we are satisfied that none of the matters admittedly known to plaintiff up to and including the time of completion of the transaction compelled such a conclusion as a matter of law.

The evidence is clearly sufficient to support the implied finding of the jury that plaintiff learned nothing to arouse his suspicions during the period between the completion of the transaction and the alleged discovery of the fraud in 1941. The record shows that plaintiff went to Europe some time in 1936 and remained there until January of 1941, when he returned to New York. He testified that prior to that time he had no information, nor had anything come to his attention, that would make him suspect that he had been "overreached" in the transaction, or had not received the full value of his stock, or had been defrauded. Although absence from the locality would not toll the statute of limitations if it had already commenced to run (for example, if plaintiff had been put on inquiry by facts known to him prior to his trip to Europe), it was a relevant factor to be considered by the jury in explanation of the delay in discovery. (See *Seeger* v. *Odell*, 18 Cal.2d 409, 418 [115 P.2d 977, 136 A.L.R. 1291] ; cf. *Teats* v. *Caldwell*, 28 Cal.App. 206, 210 [151 P. 973].

Defendants contend, next, that plaintiff has not established sufficient facts relating to the claimed actual discovery of the fraud in 1941. In addition to negativing notice of the fraud and excusing failure to discover it sooner, plaintiff must allege and prove facts showing the time and surrounding circumstances of the discovery and what the discovery was. (See *Davis* v. *Rite-Lite Sales Co.*, 8 Cal.2d 675, 681 [67 P.2d 1039] ; *Kelly* v. *Longan*, 5 Cal.2d 274, 276-277 [53 P.2d 971] ; *Consolidated R. & P. Co.* v. *Scarborough*, 216 Cal. 698, 703 [16 P.2d 268] ; *Original Min. & Mill. Co.* v. *Casad*, 210 Cal. 71, 75 [290 P. 456] ; *Victor Oil Co.* v. *Drum*, 184 Cal. 226, 241 [193 P. 243].)

In applying this rule it is important to recognize the dis-

tinction between cases where the plaintiff is under a duty to inquire and those in which he is not obliged to make any investigation until he has notice or knowledge of the happening of some incident or of some fact or facts sufficient to arouse the suspicions of a reasonable person. █ Where there is a duty to investigate, the plaintiff may be charged with knowledge of the facts which would have been disclosed by an investigation; but where, as here, there is no prior duty to investigate, the statute does not run until he has notice or knowledge of facts sufficient to put a reasonable man on inquiry. █ The rule that the plaintiff must show what information he has obtained, so that the court may determine whether or not the facts leading to the discovery of the fraud existed for more than three years prior to the commencement of the suit and could have been discovered by the exercise of ordinary diligence, is applicable only where the plaintiff was under a duty to make a diligent inquiry and he seeks to excuse his failure to discover the fraud by showing that the true facts were not then available or that the inquiry he did make was diligent, though unsuccessful. (See *Consolidated R. & P. Co.* v. *Scarborough,* 216 Cal. 698, 703-704 [16 P.2d 268]; cf. *Phelps* v. *Grady,* 168 Cal. 73, 77-78 [141 P. 926]; *Wood* v. *Carpenter,* 101 U.S. 135, 140 [25 L.Ed. 807]. █ In the absence of a duty to make inquiry, as pointed out above, the statute does not run merely because the means of discovery were available, and plaintiff is not compelled to disprove that such means existed. He need only establish facts sufficient to show that he made an actual discovery of hitherto unknown information within three years before the filing of the action. In the Scarborough case, *supra,* the plaintiff merely showed that, after a lapse of more than the statutory period, an investigation was made which led to discovery of the fraud, but there was no showing of the reasons which prompted the investigation. As the court there pointed out (216 Cal. at p. 704), for all that appeared the plaintiff may have had prior knowledge of the suspicious facts, and there was no showing why an earlier investigation was not made. The requirement that plaintiff show what information he received or what suspicious facts came to his notice is imposed in order that the court may determine whether or not the discovery was made within the time alleged, that is, whether plaintiff actually learned something he did not know before. (*Lady Washington C. Co.* v. *Wood,*

113 Cal. 482, 487 [45 P. 809]; *Victor Oil Co.* v. *Drum*, 184 Cal. 226, 241 [193 P. 243]; *Galusha* v. *Fraser*, 178 Cal. 653, 657 [174 P. 311].) In the Lady Washington case, at page 487, the court said that plaintiff must "show the times and the circumstances under which the facts constituting the fraud were brought to his knowledge, *so that the court may determine whether the discovery of these facts was within the time alleged.*" (Italics added.)

The pleading on this point is sufficient. The amended complaint alleges that plaintiff had no prior knowledge that any fraud had been perpetrated; that in February, 1941, he had a conversation with a man in New York who informed him that after plaintiff had left for Europe in 1936, Charles Crocker had stated that in the settlement of the will contest Greene and Crocker's lawyer had gotten together and had given plaintiff a "fearful trimming," and that, as a part of the settlement of the contest, plaintiff had sold his stock to them for $25 a share when its actual value was at least $120 a share; that about two months thereafter he came to San Francisco and consulted with Aureguy, Harris and his present counsel; and that in the early part of May, 1941, his counsel "informed him that he had procured information that the Hobart Estate Company was and apparently had been for several years in excellent financial condition and owned numerous valuable properties which were unencumbered."

Although the supporting evidence is less detailed than the allegations, it is sufficient to bring plaintiff within the rule above stated. He testified, in substance, that upon his return to New York in January, 1941, he received "some information . . . or suggestion" from an unidentified person concerning the holdings of the Hobart Estate Company that was at variance with Greene's representations; that prior to that time he had no information, nor had anything come to his attention, that would make him suspicious that he had been defrauded; that as soon as he was able he came to San Francisco and consulted Aureguy, Harris and his present counsel; and that he then received information as to the nature and value of the company's holdings, and the status of encumbrances, that was excessively at variance with the statements made to him by Greene. Plaintiff offered no further evidence in support of the allegation regarding the conver-

sation in New York, and it is obvious from the record that his counsel did not ask him to state the details of the information received, fearing that a recital of what plaintiff learned might be inadmissible hearsay.*

Plaintiff has thus shown that he had no notice or knowledge of any suspicious facts or circumstances prior to January, 1941, that at that time he was first put on notice of possible fraud, and that within six months thereafter he made an investigation, discovered the fraud, and commenced the action. It follows, therefore, that he has brought himself within the exception to subdivision 4 of section 338 of the Code of Civil Procedure and that he is not barred by the statute of limitations.

### III. *Instructions.*

Defendants assert that prejudicial errors were committed in instructions to the jury resulting in a miscarriage of justice.

 The court instructed the jury that, ''Where a representation is made of facts which are or may be assumed to be within the knowledge of the party making it, the knowledge of the receiving party concerning the real facts, which shall prevent his relying on and being misled by it, must be clearly and conclusively established by the evidence.'' The court then specifically applied the announced rule to the facts of the present case, stating: ''Therefore, if you believe from the evidence that the defendant Greene did in fact make representations calculated to deceive the plaintiff and to induce him to part with his stock for less than its value, then he cannot excuse the deceit by showing that the plaintiff had opportunity to examine or sources of information which would have disclosed the true facts and the falsity of the representations, nor can he excuse himself by saying that the plaintiff had constructive notice of the true facts; but in order to so excuse himself it would have been necessary that the evidence clearly and conclusively establish that the plaintiff Hobart had actual knowledge of the real facts, which would prevent his

---

*Such evidence would have been admissible, not for the purpose of showing the truth of the statements made, but to establish the fact that the information was received. (*Smith* v. *Whittier*, 95 Cal. 279, 293-294 [30 P. 529]; see, *Dunn* v. *Shamoon*, 37 Cal.App.2d 486, 491 [99 P.2d 1113]; *Head* v. *Wilson*, 36 Cal.App.2d 244, 251 [97 P.2d 509]; 6 Wigmore on Evidence, (3d ed. 1940) § 1789, pp. 235-236.)

relying on and being misled by any representations of the defendant Greene."

These instructions in effect placed upon defendants the obligation of establishing certain facts by *conclusive* evidence, thereby imposing a burden of proof greater than that required by law. Conclusive evidence is defined in section 1837, Code of Civil Procedure, as "that which the law does not permit to be contradicted." (See, also, section 1978 of the Code of Civil Procedure which provides: "No evidence is by law made conclusive or unanswerable, unless so declared by this code.") Webster defines "conclusive" as "Forming an end or termination. Putting an end to debate or question; involving a conclusion or decision; decisive; final; as, *conclusive* evidence; a *conclusive* presumption." As stated in *Watkins* v. *Wallace,* 19 Mich. 57, 76: ". . . a jury instructed to act only on conclusive evidence could hardly fail to suppose it must disregard all balancing of evidence, and require a case absolutely free from any doubt."

We find no California statute or decision which requires that knowledge of facts that would prevent reliance must be established by conclusive or unanswerable evidence, and the instructions that such evidence is necessary were erroneous. The language used in these instructions was apparently taken from 3 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 895, and it was quoted in the cases of *Teague* v. *Hall,* 171 Cal. 668, 670-671 [154 P. 851] ; *French* v. *Freeman,* 191 Cal. 579, 586-587 [217 P. 515] ; *McMahon* v. *Grimes,* 206 Cal. 526, 536-537 [275 P. 440] ; *West* v. *Great Western Power Co.,* 36 Cal.App. 2d 403, 413-414 [97 P.2d 1014] ; and *Hill* v. *Garvey,* 56 Cal. App. 98, 105-106 [205 P. 61]. These decisions, however, were concerned with other principles of law set forth by Pomeroy, and the use of the word "conclusively" was not an issue and was not discussed. The cases, therefore, are not authority upon the question here involved, since it was not considered therein. (*Maguire* v. *Hibernia S. & L. Soc.,* 23 Cal.2d 719, 730 [146 P.2d 673, 151 A.L.R. 1062].)

Plaintiff cites numerous cases which hold that certain facts must be established by "clear and convincing" or "satisfactory" evidence. The use of these phrases, however, is not equivalent to a requirement of unanswerable evidence.

This court has said upon two occasions that where a deed purports to convey land absolutely, oral testimony that it was intended to be something entirely different, such as a mortgage or trust, must be "clear, convincing, and conclusive." (*Sheehan* v. *Sullivan*, 126 Cal. 189, 193 [58 P. 543]; *Goodfellow* v. *Goodfellow*, 219 Cal. 548, 554 [27 P.2d 898]; see, also, *Miller* v. *Miller*, 55 Cal.App.2d 199, 205 [130 P.2d 438]; *Stevens* v. *Fetterman*, 76 Cal.App. 741, 753 [246 P. 102]; *Smith* v. *Flynn*, 64 Cal.App. 218, 220 [221 P. 384]; *McGehee* v. *Curran*, 49 Cal.App. 186, 198 [193 P. 277]; *cf. Ford* v. *Ford*, 44 Cal.App. 415, 418 [186 P. 164]; 12 Cal.Jur. 834.) Many other decisions, however, and in particular the more recent ones, have omitted the word "conclusive," employing instead such terms as "clear and convincing," "satisfactory," and "unequivocal," and it must now be regarded as settled that, whatever the proof necessary, it need not be "conclusive." (See *Beeler* v. *American Trust Co.*, 24 Cal.2d 1, 7, 8 [147 P.2d 583]; *Stromerson* v. *Averill*, 22 Cal.2d 808, 815 [141 P.2d 732]; *Chard* v. *O'Connell*, 7 Cal.2d 663, 665-666 [62 P.2d 369]; *Carlson* v. *Robinson*, 7 Cal.2d 235, 236 [60 P.2d 426]; 12 Cal.Jur. 832; 17 Cal.Jur. 756-757; 25 Cal.Jur. 247-249; and cases cited therein.) Further, it should be noted that these decisions are concerned with certain specific matters that are totally unrelated to the problem here presented, and they do not in any way indicate the type of evidence necessary to show that a person claiming to have been defrauded knew of facts which would prevent his relying upon the representations made to him.

Plaintiff argues that the error was cured by certain instructions given at the request of defendants which contained general statements relating to the plaintiff's burden of proof in an action for fraud. The erroneous statements using the word "conclusively," however, were specifically directed to a narrow and important issue of the case, and it cannot be said that the error was overcome by general instructions relating to the burden of proof.

The court also instructed the jury that: "If false representations were made to the plaintiff by the defendant Greene, and those representations were of a nature calculated to induce plaintiff to sell his stock for the sum of $25 per share, or any other sum, a presumption arises that the false

representations induced him to do so, and that he relied upon them in making the sale of the stock." The words "or any other sum" in this instruction are confusing in that they may have led the jury to believe plaintiff was entitled to recover although the contract was not to sell at $25 as claimed by plaintiff but at $55 per share, as asserted by defendants, or at some other figure. Also, although an inference of reliance may be drawn from false representations of a nature calculated to induce a sale, it is not true that a "presumption" arises therefrom.

The jury was instructed further that: "The plaintiff had an absolute right to rely upon the expressed statements of an existing fact by the defendant Greene, the truth of which was known to Greene and unknown to him, and he was under no obligation to investigate and verify statements, to the truth of which the defendant with full means of knowledge had deliberately pledged his faith." The instruction as given was erroneous in that plaintiff did not have "an absolute right to rely" upon Greene's statements. Reliance must be justifiable, and if the jury believed that the "conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable" he should be denied a recovery. (See *Seeger* v. *Odell,* 18 Cal.2d 409, 414-415 [115 P.2d 977, 136 A.L.R. 1291].)

We are of the opinion that these errors require a reversal of the judgment. In passing upon the sufficiency of the evidence to support the verdict all conflicts must be resolved in favor of the implied findings of the jury, since it is the sole judge of the credibility of the witnesses and the weight of the evidence; but in determining whether a judgment must be reversed because of errors in instructions, we are required to examine the entire cause including the evidence and decide whether in our opinion the errors have resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½.)

This is often a most difficult and perplexing task but in the present case the condition of the record is such that the prejudicial effect of the errors is apparent.

The testimony of plaintiff and his witnesses as to essential relevant matters is disputed by defendants and the evidence is subject to conflicting inferences. Plaintiff's whole case rests upon his assertion that he agreed to settle the will con-

test for $25,000 and sell his stock for $25 per share and that he was induced to enter into the transaction in reliance upon Greene's representation that the stock was not worth more than the agreed price of $25 a share. The evidence is conflicting both as to the terms of the agreement and as to whether the asserted representation was actually made. It is Greene's word against the word of plaintiff and Aureguy.

It is significant that Harris, who was then plaintiff's attorney and who was present when the terms were agreed upon and the representation was assertedly made, failed to corroborate plaintiff and Aureguy in these two vitally important particulars. The testimony of Harris is entirely silent with respect to plaintiff's story that the transaction was made upon the basis of the payment of $25,000 for settlement of the will contest and $25 per share for the stock. He testified merely that the settlement of the will contest was integrated with the sale of the stock and that this was shown by his letter to Crocker's attorney written shortly after the last conference with Greene. In this letter Harris stated it was agreed that in consideration of the dismissal of the will contest and the transfer of plaintiff's stock, the representatives of the estate would pay $55 a share for the 833⅓ shares. The written instruments used in carrying out the agreement of the parties were to the same general effect. Although, as we have pointed out heretofore, these writings were not necessarily inconsistent with plaintiff's version of the transaction, oral testimony was required to explain the apparent discrepancy between the contemporaneous written instruments and what plaintiff claims constituted the agreement. The testimony of plaintiff and Aureguy that a specified sum was paid for the settlement of the will contest and a further fixed amount for the purchase of the stock was not supported by Harris. Nor did Harris corroborate the testimony of plaintiff and Aureguy that Greene represented the stock to be worth not more than $25 a share. This representation is the very heart of plaintiff's case, and although the extended discussion with Greene concerning it, as related by plaintiff and Aureguy, assertedly occurred in the presence of Harris, the latter testified he had no recollection that Greene gave any opinion as to the value of the stock. Thus plaintiff's version of the transaction, disputed by Greene, is not fully supported either by the con-

temporaneous writings or by the testimony of his attorney.

Moreover, as shown by the record, the jury appears to have been reluctant to return any verdict against Greene. At 10:20 p. m., some hours after it had retired to deliberate, the jury brought in a verdict against the defendant corporation for actual damages of $32,175 but with no verdict for or against Greene. The court informed the jury that it could not return a verdict against the principal without a verdict against the agent and directed it to continue deliberating and return a verdict against the agent and the principal or in favor of the agent or the principal. About three hours later, at 1:35 in the morning, the jury brought back the same verdict against the corporation with a verdict against Greene for no actual damages but for exemplary damages only in the sum of $10,000. The court again refused to accept the verdict, explaining that no verdict could be found against a principal without a verdict against the agent in the same amount. In response to a request for additional clarifying instructions, the court stated: "I find that the more explaining there is, the more confusion there is. I am not inclined to give much more in the way of instruction. I think they are fully informed and have been all along. They are confused but they have been completely instructed." At 2:02 a. m., approximately fifteen minutes after the jury had retired, it returned with the present verdict against both defendants for actual damages in the sum of $32,175, and against Greene for exemplary damages in the sum of $10,000.

It is obvious that the jury was confused in a close case in which the evidence was sharply conflicting. The errors in the instructions related to matters vital to defendants and, when considered together, must be regarded as prejudicial.

It appears that some instructions given at the request of plaintiff were outside the issues of the case and that there were certain errors in others. Since the judgments must be reversed, and as it is unlikely that the errors complained of will be repeated upon a retrial of the case, it is unnecessary to discuss them here.

IV. *Liability of Hobart Estate Company as Principal of Greene.*

Plaintiff seeks to hold defendant corporation on the theory

that Greene was its agent. There is no claim that there was any express authority from the corporation to make the alleged misrepresentations, and there is no evidence that Greene purported to act for the corporation in the transaction or that plaintiff believed that he was so acting. Plaintiff contends, however, that the corporation is nevertheless liable under the circumstances of this case.

First, it is urged that Greene gave false information to an inheritance tax appraiser which led to a false appraisement of the stock in the estate of plaintiff's father at $40 per share; that the corporation was required by law to furnish the information; that Greene acted as its agent in so doing; that by such misrepresentations the corporation committed a fraud on the public; and that any member injured thereby had a cause of action against the corporation. Plaintiff's own testimony, however, shows that he did not act or rely on the appraisal. He testified that Greene told him that the value fixed by the appraiser was too high, and that he believed Greene was telling the truth in fixing the value at $25. If he did not act or rely on the $40 valuation, he was not injured by any misinformation given to the appraiser.

Plaintiff next contends that Greene as general manager was charged with the conduct of the business of the corporation, that he desired to get rid of plaintiff as a stockholder because he was a troublemaker, and that, accordingly, by facilitating the transaction, he acted in the interests of the corporation and hence within the scope of his agency. Actual authority may be implied as well as express and the implied powers of a general agent or manager are very broad, embracing authority to do all acts customarily connected with the business in which he is engaged. (See *Los Angeles L. Co.* v. *Los Angeles,* 106 Cal. 156, 161 [39 P. 533]; 1 Cal.Jur. 716; 2 Am.Jur. 70-73; (1934) 22 Cal.L.Rev. 392, 394; *cf.* Civ. Code, § 2319.) It does not appear, however, that Greene was acting within the scope of his duties as general manager of the company in negotiating the purchase of the stock from plaintiff. The transaction was between two individual shareholders, namely, plaintiff and Greene's principal, Alice Lester. Ordinarily, a corporation is not interested in a sale of stock by one shareholder to another and, in the absence of special circumstances, such transactions are not within

the implied authority of a general manager. (See *Bisbee* v. *Midland Linseed Products Co.*, 19 F.2d 24, 27; *cf. Rattray* v. *Wickersheim Implement Co.*, 36 Cal.App. 253, 256-257 [171 P. 964].) ■■■■ Any possible advantage to the corporation derived from elimination of plaintiff as a stockholder was but incidental to the sale between the two individual shareholders and does not render the corporation liable. ■■■ It cannot be said that the involuntary acceptance of the benefit, if any, justified the imposition of liability on the corporation on the theory of ratification, since any benefit from the sale was of such a nature that the corporation could not have rejected it. ■■■■ The company was not liable merely because Greene was its president and general manager. (See Rest., Agency, § 258, Comment b, where it is said: *"Statements not connected with agent's employment.* Except where the position occupied by an agent enables him to perpetrate a fraud, a principal is subject to liability for the deceit of an agent only in connection with matters entrusted to him. Misrepresentations concerning matters which are beyond the range of what the agent is employed to handle are no more effective to create liability against the principal than are the agent's promises as to them."*)

■■■ Plaintiff contends, finally, that the corporation is liable because of the position in which it had placed Greene, who was apparently the only person who had knowledge and information as to the value of the stock and the factors on which the value depended. This contention is based on the doctrine of ostensible authority, which is defined as such authority "as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess" (Civ. Code, § 2317). Under this doctrine a principal is "bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof" (Civ. Code, § 2334). The California cases hold that, under sections 2317 and 2334, a plaintiff cannot recover on the basis of ostensible authority without a showing of facts sufficient to raise an estoppel. (*Hansen* v. *Burford*, 212 Cal. 100 [297 P. 908]; *Ernst* v. *Searle*, 218 Cal. 233 [22 P.2d 715]; *Van Buren* v. *Green*, 120 Cal.App. 461 [7 P.2d 1079]; see, also, 22 Cal.L.Rev. 392, 395,

396.) As said in *Ernst* v. *Searle*, 218 Cal., *supra*, at page 237, "its essential elements are representation by the principal, justifiable reliance thereon by the third party, and change of position or injury resulting from such reliance." (See, also, Rest., Agency, § 265.)

The evidence does not permit a finding that these elements are present here. The record is devoid of any showing that plaintiff at the time of the transaction thought or believed that Greene was acting for the corporation, or that he relied on any such belief. His attorney, Harris, wrote to Crocker's attorney that plaintiff's stock was to be transferred to the nominee of the representatives of the estate and that they would make payment therefor. Unless it can be said that Greene was acting or purporting to act for the corporation, liability should not be predicated solely on the fact that he was the only person who possessed knowledge of the value of the stock. Although the fact that Greene had special knowledge of the affairs of the corporation entitled plaintiff to rely on Greene's representations concerning those facts, it would not justify plaintiff in believing that Greene was acting on behalf of the corporation when Greene did not purport to act in that capacity and plaintiff understood that he was acting as a representative of the estate and for the purchaser of the stock.

The case of *Rutherford* v. *Rideout Bank*, 11 Cal.2d 479 [80 P.2d 978, 117 A.L.R. 383], is clearly distinguishable in that there the bank manager who was guilty of the fraudulent representations purported to be acting for the bank, plaintiff believed he was so acting and was authorized to do so, and, in addition, it was customary for the manager to make statements to customers upon matters such as those embraced by the representations.

The judgments are reversed.

Shenk, J., Carter, J., Traynor, J. and Schauer, J., concurred.

SPENCE, J.—I concur in the reversal of the judgments upon the grounds stated but cannot subscribe to all that is said in the majority opinion. In my opinion, the judgments should be reversed upon the further grounds: (1) that the evidence, as a matter of law, was insufficient to establish ac-

tionable fraud and (2) that plaintiff's alleged cause of action, as a matter of law, was barred by the statute of limitations. I am of the view that the facts and the law relating to these further grounds for reversal were exhaustively and correctly discussed in the dissenting opinion written by Mr. Justice Knight at the time this cause was pending in the District Court of Appeal, to which dissenting opinion reference is hereby made. (*Hobart* v. *Hobart Estate Co.*, (Cal.App.) 148 P.2d 41, 59.)

Edmonds, J., concurred.