Filed 11/18/25  Testimonial Cathedral etc. v. EquityKey Real Estate Option CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| TESTIMONIAL CATHEDRAL LOCAL CHURCH OF GOD IN CHRIST, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> EQUITYKEY REAL ESTATE OPTION, LLC et al., <br><br> Defendants and Appellants. | B331522 <br><br> Los Angeles County Super. Ct. No. 19STCV37123 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Timothy Patrick Dillon, Judge.  Affirmed.

Much Shelist and Ryan N. Burns for Defendants and Appellants.

Richard Hofman for Plaintiff and Respondent.

————————————

Two sides came away from a 2008 deal with vastly different views of the deal.  One side viewed it as life insurance for an elderly pastor of a small church in South Central Los Angeles.  The other side maintained it had contracted to participate in the appreciation of the church property, albeit with a life insurance component to the deal.  More than a decade after the deal documents were signed, the church sued the company to end the company's interest in the church property.  After a bench trial, the court agreed the company's lien was the product of fraud and cancelled it.  The company challenges the court's statute of limitation ruling and its monetary award.  We affirm.

I

We provide some background in a light favoring the judgment.  We focus on facts relevant to the main issue of statute of limitations.  (See *Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1026–1027, 1031 [in bench trials with a statement of decision, appellate courts resolve evidentiary conflicts in support of the trial court's decision and give the evidence most favorable to the respondent the benefit of every reasonable inference].)

A

The plaintiff is Testimonial Cathedral Local Church of God in Christ, which we call the Church.  The Church describes itself as a small South Central church that serves the poor and homeless and barely generates enough income to pay its debt.

Bishop Jimmy B. Hackworth is the founder and longtime pastor of the Church.  At the time of the challenged transaction, he was in his seventies and disabled.  By 2008, Hackworth had developed tremors in his hand and could not sign his name.  As a result, he had granted powers of attorney to family members to sign documents for him.

2

Hackworth has four daughters, all of whom worked for the Church at some point. One daughter, Angela Hackworth Wilson, was a Church administrator in 2008. She eventually took over as pastor. Wilson assisted her father at the time of the transaction.

A Special Power of Attorney from 2007 granted Wilson the power to, among other things, convey property commonly known as 5707 to 5717 and 5615 South Western Avenue, Los Angeles, California 90062 for Hackworth. This is *some* of the Church's property.

The defendants are EquityKey Real Estate Option, LLC and EK Trust Services, LLC, which together we call EquityKey.

EquityKey's broker Steven Sharpe and a man named Frank Wheaton were the individuals who approached Hackworth about the transaction. Wheaton had been a legal advisor to Hackworth. He also was a friend and a churchgoer.

*As the Church frames it*, Wheaton and Sharpe, who were both representatives of EquityKey, teamed up to trick the elderly Hackworth to convey an interest in the Church's property and make an end run around its board, knowing he lacked this authority, while falsely representing the deal was just a personal deal about life insurance.

After the Wheaton-Sharpe team presented the deal to Hackworth, Wilson joined her father at meetings about the deal. At one meeting, she was presented with voluminous documents and was pressured to sign them. She did not read everything. She did not understand the documents and told Wheaton and Sharpe this. She said she was uncomfortable and had concerns. They purported to explain the documents to her and assured her there was nothing to worry about: the deal was just about life

insurance, the Church was not involved, and the papers documented the insurance transaction.

Specifically, EquityKey would obtain a $4 million life insurance policy on Hackworth's life and be named beneficiary. A doctor came to Hackworth's home to examine him in connection with the deal. EquityKey paid Hackworth $400,000, although it promised to pay more. Hackworth gave half of it to his daughters and $40,000 to the Church to repair its roof. Wilson used her share to pay for schooling.

The Church entered the picture only as part of Hackworth's assets. To boost Hackworth's net worth and thus the value of the insurance, Hackworth was supposed to list the Church's property as one of his properties. As Wilson explained it, Hackworth would need to transfer the Church property temporarily to himself and then transfer it back "as soon as the deal closed[.]"

These actions are reflected in a partly handwritten grant deed from 2008 and a printed grant deed from 2009. A handwritten note on the latter deed says, "This conveyance changes the manner in which title is held, grantor(s) and grantee(s) remain the same and continue to hold the same proportionate interest." Both deeds were recorded, and both purport to be signed by Hackworth. Robert Wheaton, who is Frank Wheaton's nephew, notarized the 2008 deed.

According to Wilson, they would not have gone through with the deal if they knew it affected the Church. The deal was presented as a personal deal concerning only Hackworth. There was no mention of EquityKey placing a lien against the Church.

*From EquityKey's perspective*, the deal was about investing in real property. EquityKey's principal and founder Jeffrey Nash explained the company's product was an alternative to a reverse

4

mortgage intended for "older homeowners." Back in 2008, EquityKey could not do a deal with entities because the product was tied to a person's life. The parties here had many months for due diligence. The contract documents clearly spelled out EquityKey's right to participate in the potential future appreciation of specified property, and its option to acquire this property upon either Hackworth's death or his breach of contract. EquityKey also would take out a life insurance policy on Hackworth to mitigate the risk of him passing away before the property appreciated and to provide funds to acquire the property.

The key documents are the Real Estate Investment Agreement; the Performance Deed of Trust (which the parties call the PDOT); and the Important Terms to Your Real Estate Investment Agreement, which we call the Terms. The trial court aptly characterized the first two documents as densely written documents in small and very small print. Nash testified clients could not change the documents.

The investment agreement is between "Qualified Homeowner" Hackworth and "Investor" EquityKey. It lists the Qualified Homeowner's address as 5701-5721 S. Western Avenue, Los Angeles, CA 90062—which encompasses the Church's address—and provides a "Property Description" ("APN No. 5005-031-041; 5005-032-037; 5005-032-038; 5005-032-039"). The agreement refers to "Homeowner" throughout and reads like a contract with an individual homeowner concerning a residence. The agreement provides, among many other things, that in exchange for an Investment Fee, "we" are entitled to share in the appreciation of the property and acquire it at the end of the Investment Term. It defines the Performance Deed of Trust as

5

the "special lien we record against the Property to secure the performance" of the agreement. The agreement refers to required life insurance issued on the Qualified Homeowner and owned by EquityKey. It includes various conditions, such as keeping the property free of liens, maintaining insurance on the property, and naming EquityKey as an additional insured and/or loss payee on required insurance policies.

The PDOT says it is a security instrument made in connection with the investment agreement, which is attached and under which "Beneficiary" EquityKey invested in specified property and received the right to acquire the property at the end of the Investment Term from "Trustor" Hackworth. It recites that Hackworth is the lawful owner of the property and uses largely the same description of the property as the investment agreement. At the top of the second page is a stray phrase, "such property is located in **Los Angeles** County at **5701-5721 South Western Avenue, Los Angeles, CA 90062.**" Like the investment agreement, the PDOT refers to the "Qualified Homeowner." It authorizes EquityKey to file the instrument in appropriate recording offices, and it ultimately was recorded. Robert Wheaton also notarized this document.

The Terms spell out additional details about the deal. The signature page has Hackworth's initials next to a statement representing he had consulted with "legal counsel, financial planner, tax advisor, heirs, beneficiaries and/or interested parties concerning this transaction."

These key documents appear to have been signed by Hackworth the same day as the 2008 grant deed: June 24, 2008.

## B

The Church says it first discovered the EquityKey lien in 2018 or 2019 when it tried to refinance a loan.  Hackworth and his family were shocked.  They unsuccessfully tried to resolve the matter with EquityKey in 2019 at a meeting with Nash and Wheaton.  At this meeting, Nash first learned Hackworth himself had not signed the transaction documents.

The Church sued later in 2019.  After several rounds of amended pleadings, the Church settled on two claims: declaratory relief and cancellation.  It sought to cancel the 2008 grant deed and the PDOT.

While the lawsuit was pending, EquityKey tried to foreclose on the Church's property based on asserted breaches of the investment agreement.  The Church sought an injunction in response.  The parties briefed the matter and submitted various supporting declarations.  The trial court granted a preliminary injunction halting foreclosure proceedings.  EquityKey eventually rescinded its notice of default that sparked these proceedings.

In May and June 2022, the parties tried the case in a bench trial.  Hackworth, Wilson, and Tammy Ferguson testified for the Church.  Ferguson is another of Hackworth's daughters.  She served as the Church's Chief Financial Officer but was not involved in the EquityKey transaction.

The defense called Ferguson and Nash.  As the trial court observed, EquityKey did not call any witness who was involved in the transaction discussions.  Nash testified he "would have okayed" the transaction as one of the heads of the company; he otherwise was not involved.  EquityKey did not provide instructions to brokers on how to present the transaction to

7

clients, and Nash did not know what Hackworth was told about the transaction.

The trial covered many issues, including alleged breaches of the investment agreement and EquityKey's supposed waiver of these breaches, the governance of the Church, Hackworth's authority to enter into transactions binding the Church, whether Hackworth ever owned the Church's property, and whether Sharpe was an agent of EquityKey.

One main issue was who signed what documents. Again, the key documents appear to be signed by Hackworth in his individual capacity. There is no notation that a power of attorney was used to sign on his or the Church's behalf. At trial, Wilson largely could not say for sure what she signed. But in the injunction proceedings, she supplied declarations saying she signed the PDOT on her father's behalf. She denied signing other documents, like the Terms. EquityKey relied on Wilson's declarations at trial and in its post-trial briefing, and the trial court relied on them in its statement of decision.

The parties provided written closing arguments and later responded to questions posed by the court. Thereafter, the court issued a 27-page, single-spaced statement of decision.

The court concluded Sharpe was EquityKey's agent, the company was responsible for his conduct, and the company "failed to exercise oversight over its agent Sharpe." Wilson had signed both the 2008 grant deed and the PDOT for Hackworth with his consent, and she had the authority and gave the appearance of authority to sign them. The Church effectively was Hackworth and his family, and they knowingly transferred church property in 2008.

8

As for EquityKey's statute of limitations defense, the court determined three- and four-year statutes of limitations applied. Any claim about the grant deeds was time-barred because the Church had notice of these deeds when Wilson executed them. Wilson knew she was transferring Church property.

But the PDOT was different. For this document, the court accepted the Church's claim of delayed discovery and determined its suit was timely. The court found credible the Church's claim it did not know the PDOT would be a lien on church property and did not learn of this lien until 2019.

On the merits, the trial court credited Hackworth and Wilson's testimony that they had been tricked into signing the documents, they believed this was just an "insurance deal," and they were unaware the PDOT would encumber Church property. This instrument thus was voidable on account of fraud.

The court cancelled the PDOT and its attendant lien. Acting as a court of equity, it ordered the Church to pay EquityKey $400,000—the sum Hackworth received in 2008—plus interest.

Both sides appealed the resulting judgment, but the Church abandoned its appeal.

## II

EquityKey challenges the statute of limitations ruling and the monetary award.

It has not established reversal is warranted on either point.

We begin by presuming the judgment is correct. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.)

## A

The applicable limitations period is an issue of law subject to independent review. But we review the trial court's factual

9

findings for substantial evidence, examining the record in the light most favorable to the court's ruling. (*Ferguson v. Yaspan* (2014) 233 Cal.App.4th 676, 682 (*Ferguson*); see also *Broberg v. The Guardian Life Ins. Co. of America* (2009) 171 Cal.App.4th 912, 921 (*Broberg*) [when a plaintiff reasonably should have discovered facts for purposes of claim accrual and whether reliance on a misrepresentation is reasonable are questions of fact that become matters of law only when the evidence supports a single reasonable conclusion].)

EquityKey maintains, and the Church does not dispute, that a four-year statute of limitations for cancellation and declaratory relief actions and a three-year statute of limitations for actions grounded in fraud apply. (See Code Civ. Proc., §§ 337, subd. (c), 338, subd. (d).) (§ 338(d).) The nature of the right sued on, rather than the form of the action, is determinative. (*Broberg*, *supra*, 171 Cal.App.4th at pp. 920–921.)

The operative complaint asserts Defendants and their agents "tricked" Hackworth into signing documents with the fraudulent intent of using him to "steal or take extensive value" out of the Church's real property, and they obtained the PDOT by fraud. Both causes of action spring from allegations of fraud, so the three-year statute controls. As the trial court noted, the misrepresentations here are material and entirely unrefuted. This wrongdoing is the crux. (Cf. *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1182 ["[F]raud undermines the essential validity of the parties' agreement. When fraud is proven, it cannot be maintained that the parties freely entered into an agreement reflecting a meeting of the minds"].)

10

The fraud limitations statute has a delayed discovery provision: "The cause of action . . . is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." (§ 338(d).) "The statute commences to run only after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry." (*Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 437 (*Hobart*); see also *Krolikowski v. San Diego City Employees' Retirement System* (2018) 24 Cal.App.5th 537, 561 (*Krolikowski*) [California courts have long construed this statute to mean the claim accrues with actual or inquiry notice].)

When a relationship of trust is involved, the requirement that plaintiffs show they were not negligent in failing to discover the fraud is relaxed. (See *Hobart*, *supra,* 26 Cal.2d at pp. 434, 437, 439–440.) Stated differently, "[t]he existence of a trust relationship limits the duty of inquiry." (*Eisenbaum v. Western Energy Resources, Inc.* (1990) 218 Cal.App.3d 314, 324; *see also id.* at pp. 322, 324–325 [following *Hobart* and recognizing that confidential and fiduciary relations exist whenever one places trust and confidence in the integrity and fidelity of another and that, in such cases, the usual duty of diligence to discover facts does not exist].)

Another important factor in assessing negligence is whether the defendant's representations "were of such a nature as to lull plaintiff into a sense of security or state of inaction, . . ." (*Hobart*, *supra,* 26 Cal.2d at p. 439.)

1

The trial court found Hackworth and Wilson did not know the impact of the EquityKey transaction on the Church's property, and the Church did not learn the PDOT was a lien on

11

its property until 2019. Then the Church "immediately took action." There was no reason to suspect EquityKey's lien before then and no notice triggering a duty to investigate. The court found Sharpe had materially misrepresented the deal, and Hackworth and Wilson relied on these misrepresentations. The court necessarily concluded this reliance was reasonable in voiding the lien. (See *Gomez*, *supra*, 54 Cal.App.5th at pp. 1026–1027 [the substantial evidence standard applies to both express and implied factual findings in the statement of decision].)

Substantial evidence supports these findings. In this trial of testimony against documents, and of undisputed wrongdoing, we cannot reject as a matter of law the Church's explanation for its delay in filing suit. (See *Krolikowski*, *supra*, 24 Cal.App.5th at p. 563 ["without some evidence that [defendant] was aware of facts that should have made it *suspicious* that appellants' pension benefits were erroneously calculated, the mere fact that [it] had all of the information available to conduct a correct calculation does not cause the limitations period to begin to accrue"].)

The only testimony about the transaction from percipient witnesses came from Wilson and Hackworth. Wilson testified they did not learn about the lien until right before the meeting with EquityKey in 2018 or 2019. Before then, they believed the transaction was just about life insurance because Sharpe and Wheaton lied to them about the nature of the transaction. They had no notice of any lien on the Church and no reason to look for one. The other Church witness at trial (Ferguson) was not involved in the transaction. She testified she first learned of the lien around 2018 when she sought refinancing for the Church.

12

EquityKey maintains the documents provided actual notice of its interest in the property when the documents were executed in 2008. There are several problems with this position.

First, we observed above that some parts of the documents are clear. Others are not.

Second, Wison testified she was confused by the documents and she raised concerns to Wheaton and Sharpe about them. They repeatedly assured her the transaction in no way would affect the Church property and induced her to sign with their misrepresentations. EquityKey offered no evidence to contradict this testimony.

We cannot say as a matter of law it was unreasonable for Wilson and Hackworth to rely on these assurances. (See *Williams v. Hilb, Rogal & Hobbs Ins. Services of Cal., Inc.* (2009) 177 Cal.App.4th 624, 634–635, 638–639 (*Williams*) [business owner's acceptance of insurance policy and failure to read the policy did not, as a matter of law, render his reliance on agent's advice unjustifiable; trial court did not err in determining this issue of fact against the agency].)

Wheaton and Sharpe hooked Hackworth on the deal before Wilson was in the picture. While he had purchased homes before, Hackworth had not completed high school, and he was elderly and infirm by the time of this transaction. Wilson had a college degree and had worked at banks in some unknown capacity, but she did not have formal training or expertise in real estate or law. She was not given the documents to review ahead of time, and she functioned as a signatory. " 'Bishop just said 'sign the paperwork for me.' "

Wheaton held a position of trust for Hackworth. He was a friend who also had served as Hackworth's legal advisor. But for

13

this deal, the evidence shows Wheaton had aligned *with Sharpe*. Sharpe and Wheaton jointly approached Hackworth, were "together as a team" in the meetings, lied about the deal, and lulled Hackworth and Wilson into inaction. They made thousands of dollars off the transaction. Sharpe received a commission of $160,000 from EquityKey for this deal, and some of this went to Wheaton.

Third, the evidence raises questions that undermine EquityKey's arguments about notice and the Church's assent: What exactly did Wilson get a chance to see, and what did she sign? Wilson said she was presented with a stack of legal documents and Sharpe and Wheaton pressured her to sign them. According to Wilson, they did not provide her with written or oral disclosures; she never signed the Terms; and she never saw any document that mentioned the Church. But the signed PDOT in our record bears the Church's address.

Instead of addressing or reconciling this evidence, EquityKey argues Wilson was not credible and we should ignore her and Hackworth's "meandering," "shifting," "nonsensical," "self-serving" and "unbelievable" testimony. The trial court found these witnesses credible, and we will not overturn this credibility finding. (See *Ferguson, supra*, 233 Cal.App.4th at p. 684; see also *Williams*, *supra*, 177 Cal.App.4th at p. 643 ["An appellate court has no power to reweigh the evidence, or to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn from the evidence"].)

2

EquityKey maintains the Church's representatives had a duty to read their contracts. It cites case law that does not

14

concern fraud, a defense mentioned in the law review journal it recurrently cites and in cases cited by the trial court in rejecting EquityKey's limitations defense.

California has long recognized fraud as a ground for equitable relief from a contract, even where the aggrieved party did not read the contract.  (See *Rosenthal v. Great Western Financial Securities Corp.* (1996) 14 Cal.4th 394, 421–422 (*Rosenthal*) [discussing Supreme Court cases going back to 1932].)

*In Rosenthal*, cited by the trial court, our high court again signaled misrepresentations may excuse a party's failure to read a contract when the party seeks equitable relief like rescission for fraud in the inducement.  (*Rosenthal*, *supra*, 14 Cal.4th at pp. 422–423 & fn. 11.)  The Court cited approvingly the Restatement Second of Contracts and discussed section 172, which provides that a defrauded party's "fault in not knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing."  (*Id.* at pp. 422–423 & 432; see also Rest.2d Contracts, § 172, cmt. a ["the mere fact that [the party] could, by the exercise of reasonable care, have avoided the mistake caused by the misrepresentation does not bar him from relief"].)

EquityKey discusses none of this law undermining its argument that courts necessarily hold parties to their contracts. Nor does it discuss the more lenient rules in the context of a relationship of trust.

3

EquityKey points to various facts it claims provided the Church with inquiry notice about its interest in the property

15

before 2018.  The trial court rejected similar arguments, and its factual findings are supported by substantial evidence.

None of EquityKey's arguments show the Church should have been "suspicious of fraud" or otherwise should have suspected EquityKey's lien on Church property.  (See *Hobart, supra,* 26 Cal.2d at p. 437.)

EquityKey talks about the "lengthy diligence period" and the "transactional complexity" of the deal, apparently referring to its own efforts on this deal.  This says nothing about notice to the Church.

EquityKey points to a 2013 letter purportedly from Wheaton, which discusses a personal tax issue Hackworth faced.  This letter was an exhibit to one of Ferguson's declarations from the injunction proceedings and was admitted at trial.  The letter is somewhat confusing, and Wheaton was not present at trial to testify about it.  In the letter, Wheaton refers to himself as Hackworth's "consultant" and raises the "insurance loan" involving EquityKey.  He notes Hackworth followed EquityKey's instructions about putting the church property in his name, and EquityKey was supposed to return the property to its "church-owned status" the day after the transaction.  EquityKey did not do this, and Hackworth was taxed on this property as an individual.  He eventually resolved the matter after several years.  The letter bolsters *the Church's* view of the deal.  It says nothing about a lien.  And it does not serve as inquiry notice about any such lien.

We similarly agree with the trial court that, in transferring church property to Hackworth in 2008 and back to the Church in 2009, Hackworth and Wilson had no reason to suspect fraud or a lien.  They understood these steps were needed to obtain a large

16

life insurance policy for EquityKey, as temporarily adding this property to Hackworth's assets would increase the insurance, and eventual payout, to EquityKey. In other words, they understood real estate was involved in the deal, just not any interest by an outsider in this real estate.

In the same vein, EquityKey points to deposition testimony that Wilson knew her father had signed a notarized document enabling her to sign documents for him in connection with Church property. Neither this fact, nor Wilson's knowledge she was given the power to sign documents for the EquityKey deal, shows she knew or should have known EquityKey would gain an interest in the property.

EquityKey suggests in the Introduction and Facts sections of its opening brief that the Church knew the true nature of the transaction because it designated EquityKey as an "additional insured" on policies covering the property. Recall this was a condition of the investment agreement. EquityKey does not return to this point in its Legal Argument section, perhaps because it did not elicit trial testimony from people who handled this issue and because it cited but did not include apparently relevant trial exhibits in our record. (See *Marriage of Wilcox* (2004) 124 Cal.App.4th 492, 498 [appellants have the duty to provide an adequate record].) We agree with the trial court that EquityKey did not show any situation involving property insurance put the Church on notice of fraud or the 2008 lien.

EquityKey says the Church should have known of EquityKey's lien when it refinanced two loans secured by the property in 2013. But the testimony was the lender did not uncover EquityKey's lien during this process. As the trial court

concluded, this transaction "did not alert the Church of EquityKey's lien."

Moreover, the mere fact that public records disclosing the lien existed is not enough, particularly here where it is undisputed the transaction, as represented to the participants, did not involve any sort of lien. (E.g., *Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 348–350 [plaintiff not charged with knowledge of information in public records for purposes of section 338(d)]; see also *Hobart, supra,* 26 Cal.2d at p. 442 [in the absence of a duty to inquire, "the statute does not run merely because the means of discovery were available"].)

In sum, the Church's causes of action involving the PDOT were timely.

B

EquityKey criticizes the monetary award in its favor as absurd and unjust because *Hackworth* is the one who should pay but is not a party, and because the court did not spell out how and when repayment should occur. EquityKey also claims "no provision was made in the Judgment for actual repayment" and worries there is no incentive to pay.

EquityKey misapprehends the award and the judgment.

The trial court weighed the equities and determined EquityKey should recoup the $400,000 it paid Hackworth in 2008. The court recognized it had flexibility in fashioning relief. Accordingly, it ordered *the Church* to repay the $400,000, with interest.

The judgment is consistent with these orders. It provides that the PDOT and any resulting lien are to be cancelled when Plaintiff (the Church) pays Defendants (EquityKey) $400,000, along with interest as spelled out in the judgment. It thus

18

created an incentive for the Church to pay in full—and quickly—by withholding the relief the Church won at trial until EquityKey is repaid.

EquityKey has not shown reversible error.

## DISPOSITION

We affirm the judgment and award costs to respondent.


WILEY, J.

We concur:


STRATTON, P. J.


UZCATEGUI, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.