Filed 4/30/26  Peck v. Grad CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JUDITH PECK, | |
| Plaintiff and Appellant, | G064524 |
| v. | (Super. Ct. No. 30-2020-01159713) |
| ROGER GRAD et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Randall J. Sherman, Judge. Affirmed.

Kowal Law Group, Timothy M. Kowal and Ryan Merker; Law Offices of Catherine Convy and Catherine Convy for Plaintiff and Appellant.

Hodel Wilks, Matthew A. Hodel and Laura A. Forbes for Defendants and Respondents.

\*          \*          \*

## INTRODUCTION

In September 2020, Judith Peck filed a complaint against Roger Grad and Snell & Wilmer, LLP (Snell & Wilmer) (collectively, Defendants) which asserted a cause of action for fraud in connection with Grad's legal representation of Peck's mother, Bettye Trowbridge Vaughen, in estate planning matters. Peck alleged that Grad had engaged in a long list of wrongful and fraudulent conduct from sometime in 2012 and extending beyond Vaughen's death in September 2016. Of the many allegations of wrongful conduct, relevant to this appeal are allegations that in March 2014, Grad had Vaughen obtain a $17.5 million split dollar life insurance policy on the life of Peck's sister, Cynthia Peck. The policy had a lump sum premium of $7.5 million, which was financed by a loan to Vaughen, and the policy owner/beneficiary was a trust created for Vaughen's grandchildren.

The trial court granted a motion for summary judgment brought by Defendants. The trial court found the claims of fraud, other than those based on split dollar life insurance policy, were barred by the three-year statute of limitations of Code of Civil Procedure section 338, subdivision (d) (section 338(d)). With respect to the split dollar policy, the court concluded that Peck lacked standing to assert fraud because any damages had been incurred by Vaughen's inter vivos trust, and only trustees have standing to assert a claim of damages to a trust.

In this appeal from the resulting judgment, Peck challenges only the trial court's decision regarding her fraud claim based on the split dollar life insurance policy. She argues that as a trust beneficiary she had standing to assert that claim and the complaint was timely filed with respect to the split dollar life insurance policy because the statute of limitations did not

2

accrue until 2019 or 2020, when she obtained certain information regarding the split dollar policy that supported her fraud claim.

We affirm on the ground the fraud cause of action was barred by the three-year statute of limitations of section 338(d).[1] Although a statute of limitations defense typically raises a factual question for the trier of fact, summary judgment is appropriate "'if the court can draw only one legitimate inference from uncontradicted evidence about the limitations issue.'" (*Choi v. Sagemark Consulting* (2017) 18 Cal.App.5th 308, 323–324.) Here, only one legitimate inference may be drawn from the uncontradicted evidence: By September 9, 2017, more than three years before filing the complaint, Peck knew of facts sufficient to make a reasonably prudent person suspicious that Grad had engaged in some type of wrongdoing regarding the split dollar life insurance policy.

## FACTS

Vaughen was born in the early 1920's and died in September 2016. Peck is Vaughen's older daughter and sometimes served as caregiver during the last seven years of her mother's life. Cynthia Peck (Cynthia)[2] is Vaughen's younger daughter. Jesse Trowbridge (Jesse) is Vaughen's biological grandson whom Vaughen adopted as her son.

Snell & Wilmer is a law firm. Grad is an estate planning attorney and a partner in Snell & Wilmer.

---

[1] As we shall explain, the parties had full and fair opportunity to address the statute of limitations issue and, therefore, Code of Civil Procedure section 437c, subdivision (m)(2) (section 437c(m)(2)) does not require us to request supplemental briefing.

[2] We refer to Cynthia Peck and Jesse Trowbridge by their respective first names in order to avoid confusion, and not out of disrespect.

In 2000, Vaughen created the Bettye Trowbridge Vaughen Inter Vivos Trust (the Trust). Vaughen was the original trustee. Under the terms of the Trust, upon Vaughen's death, certain Trust assets would be distributed to Vaughen's children, including Peck and Jesse, with the remainder allocated between a children's trust and a grandchildren's trust. The beneficiaries of the children's trust included Peck, Cynthia, and Jesse.

Vaughen suffered strokes in 2006 and 2009 which left her homebound, disabled, and dependent on others for care. In May 2010, at about age 88, Vaughen resigned as trustee of the Trust and appointed Richard Jackson and Jeanette Robertson as successor co-trustees of the Trust.

Grad represented Vaughen in estate planning matters from sometime in 2012 until her death in September 2016. Peck alleged Grad engaged in wrongful conduct in his representation of Vaughen and in his handling of her estate after her death in regard to ten topics: (1) drafting and having Vaughen execute several amendments to and restatements of the Trust; (2) preparing and having Vaughen execute an advanced health care directive naming himself and Jackson as agents to make health care decisions for her; (3) preparing and having Vaughen execute a durable limited power of attorney to Jackson and Robertson; (4) interfering in Vaughen's promise to buy Peck a home in Laguna Woods "in appreciation for all the care she provided to her for many years"; (5) selling to himself at a deep discount Vaughen's coin collection and using the proceeds to partially offset the loan for the Laguna Woods home rather than to pay off Peck's mortgage on another home; (6) misleading Peck into signing an agreement whereby she would be given an option to purchase from the Trust a home in Newport Beach rather than inheriting that home outright; (8) preparing

4

paperwork by which Jackson and Robertson could cancel a real estate holding company that was supposed to be distributed to Peck; (9) creating limited liability companies to be used as shell companies to receive transfers of real property from the Trust; and (10) having Vaughen purchase a $17.5 million split dollar life insurance policy on the life of Cynthia with the $7.5 million premium being paid by a loan obtained by Vaughen.

The statement of facts and statement of the case in Peck's opening brief go over in some detail each of those claims of wrongdoing. However, Peck does not challenge the trial court's conclusion that her fraud cause of action was time-barred as to Nos. 1 through 9. In the discussion sections of Peck's opening brief and reply brief, she argues only that she timely filed her complaint with regard to No. 10—the split dollar life insurance policy—and that she had standing to file that claim. The remainder of this statement of facts therefore will be limited to general facts and claims concerning that insurance policy. Facts concerning delayed discovery and accrual of the statute of limitations are presented in part II.C of our discussion section, *post*.

In March 2014, Grad had Vaughen take out a split dollar life insurance policy on Cynthia's life. According to Grad, a split dollar life insurance policy is one in which "one person pays [the premiums] and the other person benefits." When death benefits are paid, the beneficiary of the policy pays back the amount of the premiums to the party who paid them. For estate planning, the purpose of a split dollar policy is to create tax savings by reducing the value of the estate.

The split dollar policy on Cynthia's life paid a death benefit of $17.5 million. The owner and beneficiary of the policy was the grandchildren's trust. The premium was $7.5 million, which was financed

entirely by a loan to Vaughen with the split dollar policy assigned to the lender as collateral for the loan. The loan carried interest at the annual rate of 4.6 percent, which amounted to annual interest of about $216,700 in the first year and which increased each succeeding year. The policy was to be discontinued upon Vaughen's death. Grad later explained that if Cynthia died during the policy period, the grandchildren's trust would receive the death benefit but would be required to pay Vaughn's estate $7.5 million for premiums paid.

Vaughen signed documents for the split dollar life insurance policy on March 4, 2014. Peck was present when Vaughen signed those documents, but Peck did not know what they were. On March 6, 2014, Grad assisted Vaughen in placing a telephone call to the lender to verify information necessary to obtain the loan to pay the premium on the split dollar life insurance policy.

With respect to the split dollar life insurance policy, Peck contends:

1. In March 2014, Vaughen was suffering the effects of strokes, unable to make decisions or understand what she was signing, and was hospitalized or incapacitated. Vaughen had no idea what she was signing in order to obtain the split dollar policy, loan, and assignment.

2. Grad tried to defraud the Trust beneficiaries and the insurer which issued the split dollar life insurance policy by trying to cancel the policy after the loan was obtained.

3. Grad personally benefitted from the split dollar policy because upon policy execution a commission of $1.177 million or $1.7 million (there is a discrepancy in the record) was paid to a consulting firm for which Grad

6

served as chief executive officer. Soon after receiving the commission, Grad cancelled the consulting firm's corporate status.

4. Grad obtained the split dollar life insurance policy by making false representations to the insurer that Cynthia's net worth was over $6 million when in fact she was of modest means.

5. Grad misrepresented to Peck that the split dollar policy was a term policy from which Cynthia would not receive any benefit. The policy was in fact a whole life policy from which Cynthia could obtain funds.

6. Due to the split dollar policy and the loan obtained against it, Vaughen's estate was subject to an audit, which caused the estate to incur more than $1.4 million in attorney fees as well as increased trustee fees and costs.

7. Vaughen's estate was obligated to pay interest of 4.6 percent on the $7.5 million loan. For the period of March 10, 2019, through March 9, 2020, the total amount of interest was $332,450.

## PROCEDURAL HISTORY

Peck filed her complaint against Defendants on September 10, 2020. She filed an amended complaint in July 2021. Peck asserted causes of action for elder abuse, conversion, breach of fiduciary duty, fraud, and intentional interference with expected inheritance.

The trial court sustained demurrers to the amended complaint with leave to amend the fraud cause of action. Plaintiff filed a second amended complaint asserting only an amended fraud cause of action.

In February 2024, Defendants brought a motion for summary judgment. The motion was made on the ground the fraud cause of action (1) was barred by the three-year statute of limitations of section 338(d) and

7

(2) lacked merit because Peck could not establish false representation and reliance.

In April 2024, the trial court denied Peck's ex parte request for a 90-day continuance of hearing on the motion for summary judgment but granted Peck a two-week extension based on personal circumstances of her counsel. The hearing was set for May 24, 2024, which made Peck's opposition papers due on or before May 10, 2024 (former Code Civ. Proc., § 437c, subd. (b)(2); Stats. 2016, ch. 86, § 22).

On May 10, 2024, Peck filed opposition consisting only of a memorandum of points and authorities and a declaration from an attorney named Hallie J. Lindsey. The memorandum of points and authorities cited to Peck's complaint, Defendants' separate statement, and an opposition separate statement, but not to any actual evidence. Peck did not submit a responding separate statement as required by Code of Civil Procedure section 437c, subdivision (b)(3). The declaration was not signed. Peck again requested a continuance of the motion in order to conduct discovery.

On May 14, 2024, Defendants timely filed a reply in support of their motion for summary judgment and objections to the Lindsey declaration. On the next day—May 15, 2024—Peck filed a "declaration re delay" from her counsel, which attempted to justify the failure to timely file opposition to the summary judgment motion. On May 16, Peck filed another declaration from her counsel. Attached to this declaration were hundreds of pages of evidence offered in opposition to the summary judgment motion.

On May 17, 2024, Defendants filed a request to strike all of the opposition papers filed by Peck, including (1) her memorandum of points and authorities, (2) the unsigned Lindsey declaration, (3) counsel's May 15

declaration and exhibits, (4) counsel's May 16 declaration and exhibits, and (5) Peck's evidentiary objections.

On May 20, 2024—ten days after her opposition was due—Peck filed her own declaration setting forth her version of events and attaching over 100 pages of exhibits. On May 22—two days before the hearing—Peck filed "supplemental opposition" to the summary judgment motion. The supplemental opposition consisted of a memorandum of points and authorities and Peck's opposition separate statement of disputed and undisputed facts.

Defendants filed a request to strike Peck's May 20 declaration and a request to strike Peck's opposition separate statement.

A tentative ruling on Defendants' motion for summary judgment was posted on May 23, 2024. The tentative ruling was to grant the motion on the ground the claims, except the claim based on the split dollar policy, were time-barred because Peck knew or should have been suspicious of the alleged wrongdoing more than three years before she filed her complaint. The court found that Peck lacked standing to assert claims regarding the split dollar life insurance policy. The court reasoned that damages from the split dollar life insurance policy would have been incurred by the trust and therefore only the trustees had standing to assert claims on the trust's behalf.

The hearing on the motion for summary judgment was held, as scheduled, on May 24, 2024. At the conclusion of the hearing, the trial court affirmed the tentative ruling and granted the motion. The court issued a minute order which restated the tentative ruling. The court denied Peck's request for a continuance, sustained Defendants' objections to all of Peck's late-filed documents, and ordered those late-filed documents to be stricken. The court declined to rule on Defendants' objections to the Lindsey

9

declaration because the court found that evidence was not material to its decision.

A judgment in Defendants' favor was entered in June 2024. Peck timely appealed from that judgment.

## DISCUSSION

### I

### Standard of Review and Scope of Evidence Considered

We review orders granting summary judgment de novo. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) Summary judgment is warranted if the moving papers establish there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)

We consider all of the evidence presented by the parties (except for evidence which the trial court properly excluded), liberally construe the evidence in support of the party opposing summary judgment, and resolve all doubts about the evidence in that party's favor. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1039.) We must draw from the evidence all reasonable inferences in the light most favorable to the party opposing summary judgment. (*Caliber Paving Co., Inc. v. Rexford Industrial Realty & Management, Inc.* (2020) 54 Cal.App.5th 175, 180.)

Peck does not challenge the trial court's decision to strike her late-filed documents except in one respect unrelated to the statute of limitations.[3] The stricken documents included Peck's opposition separate statement and all of Peck's evidence in opposition to Defendants' motion for

[3] Peck argues her late-filed documents were not late as to the trial court's decision on standing, which was raised sua sponte.

summary judgment, except for the Lindsey declaration. The Lindsey declaration was inadmissible because it was unsigned. (*Gonzalez v. Kalu* (2006) 140 Cal.App.4th 21, 25, fn. 2; see Cal. Rules of Court, rule 2.257.) Thus, in determining whether there was a triable issue of fact regarding the split dollar life insurance policy, we consider only the evidence submitted by Defendants in support of their motion for summary judgment.

## II.

### The Fraud Cause of Action Is Barred by the Three-year Statute of Limitations

A. *Standing*

Peck argues the trial court erred by finding she lacked standing to assert the fraud claim based on the split dollar life insurance policy. She contends the trial court raised the standing issue sua sponte and ruled on it without permitting briefing from the parties.[4] We do not address the standing issue because the fraud claim arising out of the split dollar life insurance policy is barred by the three-year statute of limitations of section 338(d).

B. *Supplemental Briefing Is Not Required*

Although, as to the split dollar life insurance policy, the trial court granted summary judgment based only on lack of standing,[5] we do not

---

[4] In addition, Peck cites cases holding that a trust beneficiary has standing to pursue claims against a third party defendant, such as Grad, who actively participated with the trustee in, and benefitted from, a breach of trust. (See, e.g., *King v. Johnston* (2009) 178 Cal.App.4th 1488, 1500.) Grad argues that Peck forfeited her challenge to the trial court's findings on lack of standing by failing to object to the court's tentative ruling.

[5] Defendants contend the trial court's findings of undisputed facts regarding the statute of limitations apply to the allegations regarding the split dollar life insurance policy as well as to the other allegations of wrongdoing. We do not read the court's order that way. While some of the trial court's

have to request supplemental briefing pursuant to section 437c(m)(2) to affirm on that ground. Under section 437c(m)(2), "[b]efore a reviewing court affirms an order granting summary judgment or summary adjudication on a ground not relied upon by the trial court, the reviewing court shall afford the parties an opportunity to present their views on the issue by submitting supplemental briefs." We did not request supplemental briefing but the parties had full and fair opportunity to brief the statute of limitations with respect to the split dollar life insurance policy, and Peck devoted a substantial portion of both her opening brief and reply brief to that issue. (See *Hooked Media Group, Inc. v. Apple Inc.* (2020) 55 Cal.App.5th 323, 336, fn. 1 [if a party "has been afforded an opportunity to present its views, no supplemental briefing is required"]; *Bains v. Moore* (2009) 172 Cal.App.4th 445, 471, fn. 39 [the purpose of section 437c(m)(2) was "fully met" because both appellants and respondents addressed in their briefs the ground for summary judgment that was not relied on by the trial court].)[6]

C. *The Statute of Limitations Accrued No Later Than September 9, 2017, More Than Three Years Before Peck Filed Her Complaint.*

The statute of limitations for fraud is three years. (§ 338(d).) "The cause of action in that case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." (*Ibid.*)

---

general findings, such as those regarding Vaughen's capacity, would apply to the split dollar policy, none of the findings specifically address that policy.

[6] Grad argues that Peck's failure to comply with summary judgment procedure, including her failure to file a timely responding separate statement, is sufficient reason alone to affirm the judgment. Code of Civil Procedure section 437c, subdivision (b)(3) gives a *trial court* discretion to *grant* a summary judgment motion if the opposing party does not comply with the separate statement requirement; that statute does not give the *Court of Appeal* discretion to *affirm* summary judgment on that ground.

"The statute commences to run only after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry." (*Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 437.) "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1111; see *Vera v. REL-BC, LLC* (2021) 66 Cal.App.5th 57, 69 ["A fraud claim will accrue even without actual knowledge if a plaintiff knows facts that should raise suspicion and trigger a further investigation"].)

Peck filed her complaint on September 10, 2020. The undisputed facts establish that by September 9, 2017, Peck had knowledge of facts sufficient to make a reasonably prudent person suspicious of wrongdoing.

Peck saw Vaughen sign the split dollar life insurance policy documents on March 6, 2014. Peck did not know what those documents were, and Grad did not, at that time, explain to Peck what Vaughen was signing. But on that date, Cynthia was handed a notebook containing documents pertaining to the split dollar life insurance policy. Jackson took the notebook from Cynthia, removed financial information, and handed the notebook back to her. Cynthia later gave copies of the contents of the notebook to Peck and to Jesse.

By the time Vaughen signed the split dollar policy documents and loan documents, Peck had formed the beliefs that Vaughen had been "gravely disabled" since 2009 and that Vaughen did not have capacity to enter into the trust amendments and restatements prepared by Grad or to make any

13

changes to her estate plan. In an e-mail dated November 20, 2014, Peck told Grad and Jackson that Vaughen's 2009 stroke "involved the entire frontal lobe" and "[i]t is not acceptable to me to be changing the long term plans my mother had for me . . . ." Grad responded with an e-mail stating "[i]f you really believe that your mother has lacked sufficient mental capacity to make any decisions with regard to her assets or her estate since April 11, 2011 you should consult your own legal counsel . . . ."

In early 2015, Peck retained counsel in connection with concerns she had over Vaughen's estate. Peck and her attorney met with Grad on October 21, 2015, to ask him about changes to the Trust and the split dollar life insurance policy.[7] At that meeting, and again in October 2016, Peck's counsel requested an accounting of the Trust.

In an e-mail to Jackson dated February 5, 2015, Peck "pose[d] the issue" of how Cynthia could have passed a physical for "the life insurance" just a few months before being diagnosed with severe heart valve damage. In an e-mail to Jackson dated April 28, 2016, Peck complained that "hidden from the Life insurance policy" was that Cynthia suffered from Reiter's syndrome. Peck wrote: "You already know what I think of C[ynthia]'s

---

[7] Peck alleged: "Plaintiff was made aware of a life insurance policy, which was represented to Plaintiff by Defendant Roger Grad to be a term policy. Specifically, on or about October 21, 2015, Plaintiff met with . . . Grad to discuss various matters of . . . Vaughen's ongoing care [and] the life insurance policy that was obtained. . . . [¶] . . . During the October 21, 2015 meeting, Plaintiff requested information from . . . Grad regarding the life insurance policy. In response, . . . Grad represented to Plaintiff and [Plaintiff's attorney], who was present at the meeting as well, that the life insurance policy was a term policy and that Cynthia Peck could not and would not receive any personal benefit from the policy. . . . Grad specifically stated to Plaintiff that the policy was obtained to save the estate in taxes that would benefit the beneficiaries, including Plaintiff."

14

perspective(s) on health, including her own health, and I think you should be aware of what I think of this over the top health cost for C[ynthia] to be holding onto that $17 million life insurance policy, which if they find out would be null and void anyway."

In August 2016, Cynthia forwarded to Peck an e-mail dated January 17, 2014, regarding the status of the loan for the split dollar life insurance policy premium and "housekeeping duties to perform" once the loan offer was made. In an e-mail dated August 26, 2016, Cynthia told Peck that "[t]he 'trust' set up for me is supposedly from the savings the estate will save by having borrowed against the $17 million *whole life* policy on me." (Italics added.) In another e-mail to Peck on the same date, Cynthia wrote that Grad's "scheme is crumbling."

A family meeting was held on September 19, 2016, soon after Vaughen had passed away. At this meeting, Jesse brought up the subject of the split dollar life insurance policy and asked whether it was for estate taxes. Grad responded by explaining what a split dollar policy was and that its purpose was to serve as a "tax shield" by decreasing the value of the estate. Grad identified Cynthia as the insured on the policy and amount of the death benefit as $24 million. When Peck asked Grad to explain further, he declined and suggested instead that she do a google search on "multigenerational split dollar." Grad then stated that Vaughen had taken the policy out on Cynthia's life and that Cynthia was not the owner, could not cancel the policy, and was "completely unconnected other than [being] the insured." Grad explained that Vaughen had borrowed the money to pay the premium, the grandchildren's trust was the owner/beneficiary, and the policy would be cancelled when Vaughen's estate was closed. Peck asked if it was

true that the loan for financing the premium had "$780,000 worth of interest on it in two years." Grad replied, "No."

In an e-mail dated February 11, 2017, Peck told her daughter that having Vaughen sign the split dollar life insurance policy was "elder fin[an]c[i]al abuse." Peck also wrote: "This all demonstrates there is clear and convincing evidence of the fraud the estate knew about before the 2 years and the actions they took to avoid that discovery by the life insurance company. Per C[ynthia] the policy costs $280[,000] per year and I was there w[hen] roger [Grad] said it would be cancelled post death. Also $280[,000] per year is $840 K if 3 years since inception and the savings per the confidential memo from Roger . . . of the family meeting is anticipated to be 155 of the grandchildren's trust of $5.4 million. Well, guess what, they lost at $810 K savings."

With the e-mail, Peck sent her daughter copies of various documents relating to the split dollar life insurance policy, including the table of contents from the split dollar life insurance policy notebook that had been given to Cynthia and a projected loan performance schedule.

The evidence thus shows that by February 2017, Peck believed that Vaughen lacked capacity in March 2014 to make decisions and sign documents relating to her estate, knew of the split dollar life insurance policy and its terms, had copies of policy documents and documents related to the loan, knew the amount of the premium, knew the premium had been financed by a loan to Vaughen of $7.5 million, knew the amount of the annual projected interest payments on that loan, and knew that the policy would be cancelled upon the close of Vaughen's estate. By early 2015, Peck was concerned enough about Grad's handling of Vaughen's estate that she retained counsel. By April 28, 2016, Peck expressed her suspicions that the

16

split dollar life insurance policy had been fraudulently obtained by failing to disclose Cynthia's true health condition to the insurer. Cynthia's August 26, 2016, e-mail alerted Peck that the split dollar life insurance policy might in fact be a whole life policy rather than a term policy. By February 2017, Peck believed that Grad had committed fraud and financial elder abuse by having Vaughen take out the split dollar life insurance policy.

In addition to her knowledge about the split dollar life insurance policy, Peck disliked and distrusted Grad, and her dislike and distrust should have heightened her suspicions. In fact, Peck had not liked or trusted Grad since the day in 2011 when she first met him. By September of 2015, Peck was concerned that Grad was having Vaughen sign documents when she was disoriented. Peck even complained about Grad to the Newport Beach Police Department. In December 2016, Peck told her daughter in an e-mail that Grad had Vaughen sign documents without regard to Vaughen's medical condition or medication she was taking.

Peck had come to believe by May 4, 2014, that Grad was restricting her access to Vaughen. She believed Grad was acting unethically and untruthfully. In an e-mail to Jackson dated February 18, 2015, Peck wrote that "you guys" were "shutting down any communication with me whatsoever" and were "in there coaching my mother who [cannot] remember a thing or process any complexities of anything explained to her." In September 2015, Peck said in an e-mail the she was "dumbfounded" at Grad going to Vaughen's house "unsupervised" to have Vaughen sign documents.

At the family meeting in September 2016, Peck confronted Grad and accused him of making false statements, abusing and denigrating her, taking Vaughen's coins, coercing Vaughen to sign documents, and "violat[ing] everything my mother ever put in writing." By late 2016, Peck, as well as her

siblings Cynthia and Jesse, were investigating Grad's handling of Vaughen's estate and what they perceived to be self-dealing. Peck, Cynthia, and Jesse routinely exchanged communications and documents regarding Grad. In her August 26, 2016, e-mail to Peck, Cynthia claimed that Grad's "scheme" was "crumbling."

Peck argues she did not learn of the commission paid on the split dollar policy and of alleged misrepresentations made to the insurer regarding Cynthia's net worth until 2019 during discovery conducted in probate lawsuits. Peck also contends it was not until February 2020 that she obtained a copy of the transcript of the call placed by Vaughen and Grad to verify to the lender information necessary to obtain the loan to pay the premium on the split dollar policy.

The statute of limitations commences not when a party learns of all facts supporting a claim, but when a party had facts "sufficient to make a reasonably prudent person suspicious of fraud." (*Hobart v. Hobart Estate Co., supra*, 26 Cal.2d at p. 437.) "'Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them.'" (*Choi v. Sagemark Consulting, supra*, 18 Cal.App.5th at p. 323, quoting *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807.) By September 9, 2017, Peck knew of facts that would make a reasonably prudent person have reason to suspect that Grad had engaged in some type of wrongdoing in procuring the split dollar life insurance policy.

An analogous situation arose in *Optronic Technologies, Inc. v. Celestron Acquisition, LLC* (2025) 108 Cal.App.5th 770.) There, the plaintiff alleged a cause of action for tortious interference with prospective economic advantage based on an allegedly fraudulent transfer that was completed on

18

January 1, 2020. (*Id.* at pp. 782–783, 787, 789–790.) The plaintiff did not file its complaint until November 2022, after the two-year statute of limitations had elapsed. (*Id.* at p. 789.) The plaintiff contended the tortious interference claim was not time-barred because it did not learn until December 2021, upon receiving a copy of an e-mail, that the transfer constituted an independently wrongful act. (*Id.* at p. 790.) The Court of Appeal concluded the plaintiff was aware of the transfer and its allegedly fraudulent nature in February 2020 and therefore "had ample information to either pursue the cause of action or further investigate [the defendant's] role." (*Ibid.*) Here, Peck was aware of the split dollar life insurance policy and its allegedly fraudulent nature by September 9, 2017. Further knowledge was unnecessary to trigger the statute of limitations.

Peck argues Grad actively concealed his misconduct, misrepresented the split dollar policy's type and benefits, and "stonewalled Peck's requests for trust accountings." In support of that argument, Peck cites only to late-filed evidence that was stricken by the trial court.

Peck argues there remains a triable issue whether she exercised reasonable diligence in investigating her claims against Grad. To invoke delayed accrual, a plaintiff must establish both that plaintiff conducted "a reasonable investigation of all potential causes of that injury" (*Fox v. Ethicon Endo-Surgery, Inc., supra*, 35 Cal.4th at p. 808) and "had no actual or presumptive knowledge of facts sufficient to put him [or her] on inquiry" (*Hobart v. Hobart Estate Co., supra*, 26 Cal.2d at p. 437). If we were to assume that Peck exercised reasonable diligence in investigating the split dollar life insurance policy, the undisputed facts nonetheless establish she had enough actual or presumptive knowledge by September 9, 2017, to form

19

more than "a suspicion of wrongdoing" triggering the running of the statute of limitations. (*Jolly v. Eli Lilly & Co., supra*, 44 Cal.3d at p. 1111.)

## DISPOSITION

The judgment is affirmed. Defendants may recover costs on appeal.


SANCHEZ, J.

WE CONCUR:


MOTOIKE, ACTING P. J.


SCOTT, J.